## UNITED STATES v. SPAULDING.

No. 161. Argued November 15, 1934.—Decided January 7, 1935.

*Mr. Will G. Beardslee,* with whom *Solicitor General Biggs* and *Messrs. Wilbur C. Pickett, Randolph C. Shaw,* and *W. Marvin Smith* were on the brief, for the United States.

*Mr. Warren E. Miller* argued the cause and filed a brief, and *Mr. Philip D. Beall* also filed a brief, for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

In September, 1917, respondent, then 24 years old, enlisted in the United States Navy. He was successively commissioned ensign and lieutenant, and became an air pilot. He was honorably discharged June 30, 1922. While in the service he obtained a policy of war risk insurance which lapsed November 30, 1923. He brought this suit March 15, 1932, in the federal district court for northern Florida to recover the amounts payable under

the policy for total permanent disability alleged to have resulted from kidney disease and injuries received in an airplane crash occurring while the policy was in force. At the close of all the evidence the United States moved for a directed verdict. The motion was denied, the jury found for respondent, and the court gave him judgment which was affirmed by the Circuit Court of Appeals. 68 F. (2d) 656.

The policy covers total permanent disability, whatever its cause, occurring before the lapse. The evidence was not confined to that period, for respondent's subsequent condition is pertinent to the extent that it tends to show whether he became totally and permanently disabled before the lapse. *Lumbra* v. *United States,* 290 U. S. 551, 560. The United States maintains that the evidence was not sufficient to sustain the verdict. And that is the sole question presented for our consideration.

The material substance of the evidence follows.

In the latter part of 1919, respondent first had kidney trouble. According to the naval medical records, he was sick four times from what was finally diagnosed as a kidney stone. These illnesses were in June and September, 1920, and in January and August, 1921; their duration in all was about six weeks; while they lasted urinalyses sometimes disclosed albumin, casts and corpuscles in varying quantities. Some time after the last attack, the stone was removed. November 14, 1921, respondent's upper and lower jaws were fractured in the airplane crash. He was in the naval hospital until February, 1922. He testified that he continuously had kidney trouble and severe pains in the head and back. When discharged the only defect noted was that his teeth did not occlude properly. Due to that he had gastritis February 28. Urinalysis then disclosed very few blood cells, occasional pus cells but no albumin or casts. The gastritis disappeared. In May following, his teeth were treated for the malocclu-

sion. Respondent testified that he was then suffering kidney pains and that his left antrum was much swollen. A civilian, Dr. Quina, treated the antrum.

May 31 respondent went again to the hospital. He then stated that two years earlier he had suffered acute illness following exposure in wet and cold, had not felt well since and for the last month had been treated for kidney trouble. The diagnosis then made was "nephritis chronic parenchymatous." June 26, 1922, he was examined for discharge from the service. The medical officers noted their opinion that the nephritis was due to toxic materials absorbed from the antrum and that infection of the antrum resulted from injuries sustained in the airplane crash. He was found "not physically qualified for active duty in the Navy by reason of the following physical defects which are of a more or less temporary nature: Infection of left antrum and malocclusion of the teeth." And on that day he certified that he had the following disabilities entitling him to compensation under the War Risk Insurance Act: Infection of the left antrum, malocclusion of the teeth, stomach trouble and heart murmur. He made no claim that he had become totally and permanently disabled or that he was entitled to the amounts that under the policy are payable therefor.

Respondent did nothing from the time he was discharged until February, 1923. He testified that during that period he was ill and under the care of doctors, who forbade work. When he finally did work, it was against their orders and to support his family. From February, 1923, until April, 1924, he took vocational training. During that time his policy lapsed. He quit before completion of the course because, as he says, he was no better and thought outdoor work would be good for him. Then for more than a year he was employed as an automobile salesman. Much riding over rough roads aggravated his condition and prevented continuous work. He was paid

a salary of $125 per month for a part of the time and commissions for the remainder.

Commencing about September 1, 1925, respondent for seven months was employed as superintendent of construction of roads and ditches at a salary of $300 per month. He next worked for an electric company during four years and two months until September, 1930. For the first five or six months he was a salesman and earned commissions amounting to about $500. He then became superintendent of electrical work at a salary of $200 per month. Except for six or seven weeks in another year and three months in 1930, he received salary for every month though not able to work full time. He was discharged because he could not put in full time. Two fellow employees testified that he was ill and at home three or four days a month. That was his last employment.

An official record put in evidence by him shows that in July, 1924, he was given a special physical examination to test his qualifications for flying. It indicates recovery from the airplane crash, heart and blood pressure normal, no recurrence of kidney trouble. As a result of the examination he was officially certified to have no defects and to be qualified for flying duty as a pilot.

Commencing in 1923 while the policy was still in force, respondent was treated by Dr. Quina, to whom he went daily during the first year and three or four times weekly during the next two. His condition did not improve and, because of inability to pay the doctor, he discontinued. For a few years prior to the trial he has been going to doctors for sinus treatment as often as every other day. October 31, 1928, the Veterans' Bureau examined him, apparently in connection with his application to reinstate his insurance. He was classified as a poor risk: " This man has a chronic nephritis. Hypertension. Urine shows occasional hyaline casts and a few red blood cells." In March, 1930, he entered a veterans hospital at Washing-

ton where he remained about six weeks. The diagnoses were albuminaria, nephritis diffuse mild, moderate hypertension. It was found that no hospitalization was necessary. Dr. Fowler, a consultant in urology, found the right kidney out of position and suggested surgery. June 1, 1931, respondent went to a naval hospital for treatment of the infected antrum and remained there until July 7. It was found that his blood pressure and heart were normal. He had moderate hydro-nephrosis of the right kidney and a kink in the upper half of the right ureter. Urinalysis was negative.

Respondent called Dr. Quina, Dr. Bryan and Dr. Pierpont:

Dr. Quina had treated respondent for the antrum infection for several years after the latter's discharge from the navy. He testified that the antrum infection was incurable and that during the period of treatment respondent had nephritis caused by the infection; that it did not improve, that respondent had impaired his health by working and that " In my opinion at the time I first examined him and since that time he has not been capable of continuously carrying on a substantially gainful occupation without injury to his health." The doctor thought that under proper treatment respondent could live a long time. " I would put him in bed and keep him there. If he engages in any work it will make him die a little bit sooner." Although the witness did not testify to any change in respondent's condition, he said: " If a man had mild nephritis in 1923 and in 1932 has diagnosis of mild nephritis . . . his condition is much worse now than it was then because he still has a breaking down of the kidneys."

Dr. Bryan commenced to treat respondent in July, 1929, and at that time found chronic nephritis. He expressed the opinion that the disease existed in 1923. An examination a year before the trial indicated respondent had not improved. Absolute rest was the treatment for his con-

dition, any work physical or mental would impair his health and " If he continuously engages in any kind of work he is going to limit his days on this earth. . . . If a man has mild nephritis in 1923 and actually works for seven years and quits work in 1930 and then in 1932 still has a diagnosis of only mild nephritis I would say that he had injured himself, for a man with that type of disease would injure his health by doing any kind of work. By working he has made it worse; he might have recovered. I would . . . say he was totally and permanently disabled. I don't know about his disability from an occupational standpoint."

Dr. Pierpont never treated respondent but examined him three times shortly before the trial. He found chronic nephritis, a bad heart and high blood pressure. On the history of the case he expressed opinion that respondent's ailments dated back to 1922 or 1923. He said: " I would prescribe absolute rest . . . If plaintiff engaged in work it . . . would impair his health. From my examination I would say that the plaintiff is not able to continuously engage in any substantially gainful occupation without impairment to his health . . . If I had a patient who had an inception or beginning of that disease in 1923 and . . . had actually worked for a period of seven years continuously and then quit work for two years and then in 1932 still had virtually the same condition he had in the beginning, I would say that the disease is progressive, that the work would make his condition worse."

The terms of the contract of insurance are in accordance with § 400, Art. IV, Act of October 6, 1917, 40 Stat. 409, and extend only to death and total permanent disability occurring while it is in force whether during or after termination of the service of the insured. The policy does not cover total temporary disability or partial permanent disability and does not authorize or permit any payment for physical or mental impairment that is less than " total

permanent disability." Periods of total temporary disability, though likely to recur at intervals, do not constitute the disability covered by the policy, for "permanent" means that which is continuing as contrasted with that which is "temporary." The fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. He may have worked when really unable and at the risk of endangering his health or life. It may not be assumed that occasional work for short periods by one generally disabled because of impairment of mind or body does as a matter of law negative total permanent disability. But it is plain that work done may be such as conclusively to negative total permanent disability at an earlier time. *Lumbra* v. *United States, supra,* 558 *et seq.*

After considerate examination of the record we are of opinion that the evidence and all inferences that justifiably may be drawn from it do not constitute sufficient basis for a verdict for respondent, and that therefore the trial judge should have directed the jury to find for the United States. *Gunning* v. *Cooley,* 281 U. S. 90, 93. *Stevens* v. *The White City,* 285 U. S. 195, 203–4.

It is shown that since a time prior to the lapse of the policy respondent had incurable infection of an antrum, malocclusion of teeth and chronic nephritis that caused illness and impaired his physical and mental powers to such an extent that generally he was partially disabled and, at times and during periods of substantial duration, totally disabled. In 1924 he was found fit for service as an air pilot. During the larger part of more than eight years between the lapse of his policy and the commencement of this suit he was able to and actually did work and earn substantial compensation. In view of these facts his testimony that under stress of need he worked when not able cannot be given weight, for he is not entitled to recover on the policy unless he became totally disabled

before its lapse and thereafter remained in that condition. If not totally disabled when found fit for air service and while performing work admittedly done, total disability occurring while the policy was in force was temporary and not permanent. The fact that, notwithstanding his need of money for the support of his family and himself, he failed for nearly nine years to sue for the insurance money now claimed, strongly suggests that he had not suffered total permanent disability covered by the policy. *Lumbra* v. *United States, supra,* 560. And that suggestion is emphasized by the fact that in 1928 he procured examination for reinstatement of his insurance. The opinions of respondent's medical witnesses that work impaired his health and tended to shorten his life had no substantial bearing upon the question whether total disability while the policy was in force continued during the subsequent years. As against the facts directly and conclusively established, this opinion evidence furnishes no basis for opposing inferences.

The medical opinions that respondent became totally and permanently disabled before his policy lapsed are without weight. Clearly the experts failed to give proper weight to his fitness for naval air service or to the work he performed, and misinterpreted "total permanent disability" as used in the policy and statute authorizing the insurance. Moreover, that question is not to be resolved by opinion evidence. It was the ultimate issue to be decided by the jury upon all the evidence in obedience to the judge's instructions as to the meaning of the crucial phrase, and other questions of law. The experts ought not to have been asked or allowed to state their conclusions on the whole case. *Milwaukee & St. Paul Ry. Co.* v. *Kellogg,* 94 U. S. 469, 472. *Schmieder* v. *Barney,* 113 U. S. 645, 648. *Fireman's Ins. Co.* v. *J. H. Mohlman Co.,* 91 Fed. 85, 88. *Mullins Lumber Co.* v. *Williamson &*

*Brown Co.*, 255 Fed. 645, 646. *Germantown Trust Co.* v. *Lederer*, 263 Fed. 672, 676.

There is nothing in the record that at all impairs the significance of the finding that in 1924 respondent was fit for service as an air pilot, or of the work he performed after the lapse of the policy. These facts conclusively establish that he did not become totally and permanently disabled before his policy lapsed. *Lumbra* v. *United States, supra. Falbo* v. *United States,* 291 U. S. 646.[*]

*Reversed.*

---

[*] Cf. *United States* v. *Pollock,* 68 F. (2d) 633, 634. *United States* v. *Timmons,* 68 F. (2d) 654, 655. *Tracy* v. *United States,* 68 F. (2d) 834, 837. *United States* v. *Burns,* 69 F. (2d) 636, 638. *United States* v. *Sumner,* 69 F. (2d) 770, 772. *United States* v. *Green,* 69 F. (2d) 921. *United States* v. *Legg,* 70 F. (2d) 106. *United States* v. *Derrick,* 70 F. (2d) 162. *Huffman* v. *United States,* 70 F. (2d) 266. *United States* v. *Johnson,* 70 F. (2d) 399, *United States* v. *Lancaster,* 70 F. (2d) 515. *Atkins* v. *United States,* 63 App. D. C. 164; 70 F. (2d) 768. *Harris* v. *United States,* 70 F. (2d) 889, 891.