**UNITED STATES v. WALKER.**
**No. 7515.**

Circuit Court of Appeals, Fifth Circuit.
April 13, 1935.

Rehearing Denied May 18, 1935.

, J. Gregory Bruce, Atty., Department of Justice, and Will G. Beardslee, Director, Bureau of War Risk Litigation, Department of Justice, both of Washington, D. C., and Philip H. Mecom, U. S. Atty., of Shreveport, La., for the United States.

Thos. W. Leigh and B. D. Allbritton, both of Monroe, La., for appellee.

Before BRYAN, HUTCHESON, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

This was an action, begun June 6, 1932, on a war risk insurance certificate or policy which lapsed on May 31, 1919. Appellee's petition alleged that "at and prior to the date of his discharge from the military service on or about April 23, 1919, he was suffering from active pulmonary tuberculosis, bronchial asthma, chronic bronchitis, chronic tonsillitis, and pleurisy, and that at and prior to the time of his said discharge and continuously thereafter up to the present time he has been totally and permanently disabled by reason of said disabilities." The just-mentioned allegation was put in issue. The petition alleged that on June 26, 1931, petitioner filed with the War Risk Insurance Bureau a claim for insurance benefits due him under the certificate sued on, that said bureau thereafter handed down a ruling denying petitioner's said claim, which ruling was dated May 27, 1932, and was received by petitioner on May 31, 1932. Those allegations were admitted by the appellant. Upon the conclusion of the evidence the defendant, appellant here, moved the court to direct a verdict in its favor. The court denied that motion.

In this court for the first time the appellant challenged the claim in suit on the ground that it was barred under the statute (World War Veterans' Act, 1924, § 19, as amended [38 USCA § 445]) which provides: "No suit on yearly renewable term insurance shall be allowed under this section unless the same shall have been brought within six years after the right accrued for which the claim is made or within one year after the date of this amendatory Act [July 3, 1930], whichever is the later date: * * * Provided: * * * Provided further, That this limitation is suspended for the period elapsing between the filing in the bureau of the claim sued upon and the denial of said claim by the director." Under the statute the period of limitation was extended beyond July 3, 1930, the date of the enactment of the statute, for the period elapsing between the filing in the bureau of the claim sued upon and the denial of that claim by the director. The claim sued upon having been filed in the bureau on June 26, 1931, and this suit having been brought on June 6, 1932, the suit was brought within the time allowed if within the meaning of the statute the denial of the claim by the director became effective upon appellee's receipt on, May 31, 1932, of notice of that action. Appellant contends that the denial became effective on the day it was dated, May 27, 1932. In our opinion that contention is not sustainable.

It is to be noted that under the statute the period of extension begins with "the filing in the bureau of the claim sued upon," and ends, not with the filing of the order denying the claim, but with "the denial of said claim by the director." It well may be supposed that in enacting the statute the lawmakers had in mind the methods pursued in the bureau in dealing with such claims, that claims are transmitted by claimants from all parts of the country, and that a claimant first learns of the bureau's action on his claim when he is informed of that action by the bureau, and that communications between claimants and the bureau generally are by mail. Nothing in the language of the statute indicates a purpose to make a denial of the claim effective prior to delivery of notice of it at the place of the claimant's address. A regulation covering the matter of giving notice of disagreement to the claimant was in force at the time appellee's claim was acted on. That regulation provides for the claimant being informed by letter of a denial of his claim, and that "the suspension of the statute of limitations provided by Section 19 shall cease from and after the date of this letter plus the number of days usually required by the Post Office Department for the transmission of regular mail from Washington, D. C. to the claimant's last address of record." The adoption of that regulation was the exercise of a power conferred by section 19 of the World War Veterans' Act, as amended (38 USCA § 445). Boan v. United States (D. C.) 3 F. Supp. 219. It could not reasonably have been contemplated that the period of extension of limitation would end, with the result of enabling the claimant to bring suit on his claim, prior to the receipt at claimant's last address of record of notice of the denial of his claim. Certainly it was not contemplated that it would be permissible for a claimant to institute suit on his claim prior to his receipt of information of the denial of that claim by the director. The language used in the statute is entirely consistent with the existence of an intention that the denial of the claim become effective at the time of the receipt at the claimant's address of notice of that action. We concur in decisions to the effect that the suspension of limitation ends at that time, not before the claimant could have been aware that he had the right to bring suit on his claim. Weaver v. United States (C. C. A.) 72 F.(2d) 20; Creasy v. United States (D. C.) 4 F. Supp. 175.

A summary of the material evidence follows: The appellee had an eighth grade education. Before he entered the army he was engaged in farming and as a laborer. Just prior to his enlistment he was working for the Benson Lumber Company as an edger of rough-edge lumber that came from the saw. While serving in France he had influenza and mumps in October and November, 1918, and received treatment in several hospitals prior to his being transferred to a convalescent camp. After leaving that camp he was returned to the United States, and was discharged at Camp Shelby, Miss., on April 23, 1919. He stated: "I felt bad all the time I was in the convalescent camp, the embarkation camp and on my trip home up to my discharge. I was short of breath and had a severe cough, and expectorated." When he was discharged, he signed a statement to the effect that he did not have any reason to believe that he was suffering from the effects of any wound, injury, or disease, or that he had any disability or impairment of health, whether or not incurred in the military service. He testified that he did not know what that statement was, and that he was not asked any questions about his health or anything of that nature. His commanding officer signed a statement to the same effect, and the examining surgeon certified that a careful physical examination given the appellee at that time showed that he was physically and mentally sound. Upon his discharge, appellee went to his father's home, and remained there approximately four or five months. He testified that while there he felt bad, was weak, coughed, expectorated quite a bit, and had pains in his right side; that he did not do any work while there until the latter part of August, 1919; that about the middle of June, 1919, he went to see Dr. Carey, who told him that he had a severe case of bronchitis. From August, 1919, until the spring of 1921, appellee worked for the Benson Lumber Company. He first worked there as an edger, the position which he held before entering the army, and held that job several months, but felt bad and was unable to work all the time, and was assisted in the work; then his employer gave him a job of doing carpenter work building sheds, which was lighter work, which he did not do continuously. He estimated the time he worked for the Benson Lumber Company as about one-half time. His wages were from $3 to $4 a day, mostly $3.50 a day for the time he worked. He left because he was

not able to do the work his employer expected of him. He married in October, 1919. From the spring of 1921, to October, 1921, appellee lived with his wife's step-father, and did no work. In October, 1921, he was sent by the Veterans' Bureau to the Veterans' Hospital at Alexandria, La., for treatment for pulmonary tuberculosis. Before entering that hospital, he signed the following statement: "Having been informed by the Medical Examiner that I am suffering from tuberculosis, and understanding the necessity of me receiving proper care and treatment, in order that I may regain my health, I am prepared to accept such treatment and hospitalization as may be decided necessary for my improvement and cure.

"I will do all in my power to assist in this treatment, fully complying with all instructions and regulations, and should I neglect to do so I appreciate that I shall forfeit my right to return transportation." On December 14, 1921, he left that hospital against medical advice. Before doing so, he signed a statement to the effect that he was leaving the hospital of his own volition and against the advice of the medical officer in charge. In explanation of his leaving the hospital, he testified that he had been unable to establish his claim as service connected, and thought that by going home, so that he would be free to get information requested by the bureau, he would be able to establish that claim. During the time between the date of his leaving the hospital in December, 1921, until he was sent to the same hospital in June, 1924, appellee was not gainfully employed. In June, 1922, he was awarded compensation by the Veterans' Bureau, and drew $95 a month to January 1, 1923, and $100 a month from the latter date. After being in the hospital about two months, commencing in June, 1924, appellee left without permission. He testified: "I left without permission because seemed not like my condition was improving, and on account of my children being at home with a bad case of whooping cough." Appellee signed three other statements to the effect that he left the hospital against medical advice. Appellee stated that he came home on a furlough on two occasions, that if he came home in 1921 he went back to the hospital, and if he came home in 1924 he returned to the hospital. Between September, 1924, and the time of the trial appellee worked only intermittently for short periods and in different occupations. During

that time he was at the hospital several times. In an application for reinstatement of $2,000 of his war risk insurance, made in August, 1922, appellee stated: "I hereby certify that I am now in good health, physical and mental." That application was approved. Another application for reinstatement, made after a default in the payment of premiums, contained the answer "No" to the question, "Are you now permanently and totally disabled?" He made the same answer to the same question in an application for reinstatement made in February, 1926. By a letter dated May 27, 1925, addressed to the Veterans' Bureau, appellee asked: "What will it cost me to reinstate the other eight thousand dollars $8,000.00 of my W. R. I. If I reinstate this Insurance will my policy have a loan value?" Appellee testified: "In 1931 I realized, that is, my opinion was that I was totally and permanently disabled. My opinion is now that I have been totally and permanently disabled since I had flu in France. That probably was not my opinion in 1923." He admitted his signature to a letter, dated April 20, 1923, which contained the statement: "The evidence also shows that I became totally disabled May, 1921."

Dr. V. F. Carey testified that he examined appellee one time about the middle of June, 1919. "At that time I told him that he had an attack of bronchitis, but his case was suspicious of tuberculosis. However, I didn't keep him under observation long enough to prove it either way. I didn't say anything to him about my suspicions of tuberculosis at that time. I told him he was suffering from bronchitis, which was true. I prescribed for him by the ordinary means, rest and some little cough sedative. I made a pretty thorough physical examination over his chest; I used the stethoscope. I never examined him again after that. He was directed to come back in a few weeks and bring a specimen of his sputum, but he never came back and I never saw him again. He moved out of the community." In answer to hypothetical questions, the witness stated: "From the information I got from the first observation and the history I have gotten since then of this man's case, I would say that he has been totally disabled since 1919 and it would relate back to his influenza in the Army." * * * "It was reasonably probable would continue throughout his life." The hypothetical questions answered by the witness omitted any mention of material facts in the history

of appellee's case disclosed by the evidence. Upon being asked in his cross-examination to consider his opinion that appellee was totally disabled from the time of his discharge in the light of the statement made by the examining physician at that time that appellee was found to have no disability, and of appellee's own statement at that time that he had no disability, the witness answered: "Well, if he had been put to bed at that time it is possible he would have been a well man today." The witness stated that his testimony as to the totality of appellee's disability was based on the subsequent history of the case learned, not at the trial, but from appellee's brother, who was a neighbor of the witness. Dr. C. P. Gray, a witness for the appellee, testified that he first saw and examined appellee in 1923 and then in 1924, and at intervals since that time; that on his first examination he found "a gripple infection of bronchitis," that the term "gripple" condition "is really synonymous and would include influenza." In answer to a hypothetical question, the witness expressed the opinion that appellee's tuberculosis had developed as a result of influenza, but that he could not intelligently state what stage the disease had reached in June, 1919. The witness stated that based upon the history of the case, appellee had been disabled from 1922, and that he thought that the condition was permanent at the time of the trial. On cross-examination the witness admitted that in his report of an examination of the appellee, made in February, 1926, in connection with an application of the appellee for a reinstatement of his insurance, witness stated that appellee had been ill with tuberculosis four years, that the condition of the disease then was quiescent, and the stage of it was incipient.

 The facts that appellee himself did not until 1931 reach the conclusion that he was totally and permanently disabled, and that statements made in his applications for reinstatement of part of the insurance covered by the contract sued on were explicit to the effect that he was not totally and permanently disabled at the times those applications were made, made the burden of sustaining the allegation of his petition that he was totally and permanently disabled at the time the policy lapsed a heavy one. Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492; United States v. Spaulding, 293 U. S. 498, 55 S. Ct. 273, 79 L. Ed. ——. It is manifest from the evidence that if appellee had tuberculosis while the policy was in force, the disease then was in its incipient stage. We take judicial notice of the fact that ordinarily tuberculosis in its incipient stage is curable. No medical witness expressed the opinion that anything in appellee's condition while the policy sued on was in force made incurable the ailment he then had. Other than the evidence as to the history of appellee's case, there was no semblance of substantial evidence supporting a finding that he was totally and permanently disabled while the policy was in force. Even if it can properly be said that that evidence was consistent with a finding that appellee was totally and permanently disabled while the policy was in force, it was equally, if not more, consistent with a finding that appellee's tuberculosis became totally and permanently disabling after the lapse of the policy as a result of his own failure to take adequate treatment, which was available to him at the expense of the government. A disability which was temporary while the policy was in force cannot be converted into a total permanent disability as of that time by the insured's failure to take proper medical treatment, which was freely available to him. Eggen v. United States (C. C. A.) 58 F.(2d) 616; Wise v. United States (C. C. A.) 63 F.(2d) 307; Falbo v. United States (C. C. A.) 64 F.(2d) 948; Id., 291 U. S. 646, 54 S. Ct. 456, 78 L. Ed. 1042. That, while the policy was in force, his disability was permanent as well as total was an affirmative fact for the appellee to establish by evidence. The condition of the evidence was such that a finding by the jury that while the policy was in force appellee's tuberculosis was totally disabling, and was of a nature rendering it reasonably certain to continue throughout his life, rather than that it became permanent after the lapse of the policy in consequence of his failure to continue to accept treatment available to him, would be a mere guess or surmise. The utmost that can be said of the evidence is that the permanently disabling effect of the appellee's tuberculosis resulted either from the nature of the disease as it existed while the policy was in force, or from appellee's failure, after the lapse of the policy, to avail himself of proffered means of effecting a cure. Where the evidence leaves the matter of the permanency of the disease uncertain and shows that its permanently disabling effect may have been due to either one of two causes, one of which was appellee's fault in neglect-

ing to take available curative treatment, it is not for the jury to guess between those causes and find that appellee's permanent total disability, which did not become certain until long after the lapse of the policy, really existed while the policy was in force. New York Central R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562; Patton v. Texas & Pacific R. Co., 179 U. S. 658, 663, 21 S. Ct. 275, 45 L. Ed. 361; Eggen v. United States, supra. The burden of proof on the appellee is not carried by evidence which leaves the matter in the realm of surmise or speculation. In our opinion, the evidence did not justify a finding that while the policy sued on was in force the appellee suffered a total disability, due to tuberculosis, which then was reasonably certain to continue throughout his life. Falbo v. United States, supra. Such a finding was inconsistent with facts conclusively established by evidence. United States v. Spaulding, supra. The above-mentioned ruling was erroneous. The judgment is reversed.