**UNITED STATES v. RUCKER et al.**

No. 5402.

Circuit Court of Appeals, Seventh Circuit.

Nov. 26, 1935.

Arthur Roe, U. S. Atty., of Danville, Ill., Walter E. Ackermann, Asst. U. S. Atty., of Belleville, Ill., Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., and Armistead L. Boothe, Atty., Department of Justice, and T. E. Walsh, both of Washington, D. C., for the United States.

Charles W. Fleming and W. T. Henderson, both of Danville, Ill., for appellees.

Before EVANS and ALSCHULER, Circuit Judges, and BALTZELL, District Judge.

BALTZELL, District Judge.

Appellees, under date of May 11, 1932, filed a declaration in the District Court, wherein they seek to recover under a war risk contract of insurance. By stipulation a jury was waived and the cause tried by the court. A finding and judgment for appellees was rendered on June 9, 1934. The court found that the insured, Robert Verne Rucker, was totally and permanently disabled on or before the 31st day of March, 1919, at which time his insurance contract was in full force and effect.

The evidence discloses that Robert Verne Rucker, hereinafter referred to as the "insured," entered the military service on August 20, 1915, and was honorably discharged therefrom on February 8, 1919; that on February 5, 1918, there was issued to him a war risk insurance contract in the amount of $10,000, in which his mother,

Dolly Rucker, one of the appellees here-in, was named as the beneficiary. Premiums were paid by deduction from his pay up to and including the date of his discharge from the army, but no premiums were paid thereafter, either by himself or by any other person in his behalf. Under the law, such contract of insurance expired on March 31, 1919, because of failure to pay any further premiums thereon, unless he was, on that date, totally and permanently disabled. The insured was committed to a state institution for the insane in Illinois in the month of February, 1924, at which time he was suffering from "general paralysis of the insane." He was confined in such institution for a considerable length of time, after which time he returned home and was shortly thereafter taken to the government hospital at Marion, Ind., where he remained until the date of his death, which was December 5, 1928. The cause of his death was "general paralysis of the insane." Insured was married in the year 1920, and at the time of the trial in the District Court he had two children of the ages of 10 and 12 years. His wife, Pearl Rucker, was, on the 21st day of May, 1925, appointed by the probate court of Vermilion county, Ill., conservator for her husband, and continued to so act until the date of his death. Shortly thereafter she was appointed administratrix of his estate, and this suit was filed by her, in such official capacity, and by the mother of the insured, Dolly Rucker, as beneficiary under the insurance contract.

At the conclusion of all the evidence, appellant filed a motion requesting the court to find the issues in its favor, which motion was by the court denied, and an exception allowed. Appellant assigns several errors upon which it asks reversal of this cause; the principal one, however, being that there is no substantial evidence to sustain the finding of the court that the insured was totally and permanently disabled during the life of his contract.

Prior to entering the military service, the insured was employed as a coal miner, at which time he was in good health and able to perform the duties devolving upon him in such employment. During his service in the army, and in the fall of 1918, while fighting at the front, he suffered from a gas attack, extending over a period of several days. The effect of the gas upon him was such that he was removed to a hospital where he was confined for a considerable length of time, never returning to his outfit for duty. After his discharge from the service, he returned to the home of his mother, Dolly Rucker, in Illinois. Testimony of his immediate family, and of other persons who knew him, is to the effect that he was, at the time he returned home after discharge, in a highly nervous state, unable to sleep at night, and had a variable appetite. Shortly after his return home, he worked for a period of three or four weeks, doing what would commonly be called "janitor work" for the Business Men's Club in Georgetown, Ill., in which town he resided. He was obliged to quit this job because of the condition of his health. Prior to his entering the army he had done some work for a Mr. Dornblaser, a stock dealer, and in the month of March, 1919, he again worked for him. He was not paid any regular salary for this work, but was given a small amount of money each week with which to purchase his cigarettes and tobacco. He continued to work for this man, doing chores about the house, but after a very short time was obliged to quit, because of various physical ailments. The insured had a brother by the name of Guy Rucker, who was manager of the Coca Cola Company at Terre Haute, Ind., for which company he (the insured) began working the latter part of June, 1919. He worked at night for this concern; his duties being more in the nature of a janitor than anything else, although he was required to assist in the loading of trucks and in the crating of cases. He lost some time while working for this company, due to illness. For his services he was paid at the rate of $100 per month. His services no longer being needed, he ceased working for this company in October, 1919.

During the months of January and February, 1920, he did some work as collector for a furniture company in Terre Haute, for which he received pay at the rate of $100 per month. He was restless at night and apparently under a nervous strain at all times during his stay in Terre Haute. Immediately after quitting this work, he again returned to the home of his mother in Illinois, and her testimony is to the effect that both his mental and physical conditions were much worse than when he went to Terre Haute. However, after his return, he again attempted to work for Mr. Dornblaser, doing chores

about the house, but was unable to continue in this line of work.

An attempt was made by the government to rehabilitate him by placing him in vocational training in August, 1921. He was given training in the electrical business and was first assigned to Mr. George Campbell, of Georgetown, Ill., for whom he worked about a year, during which time he received no compensation for his services, other than that paid him by the government. Mr. Campbell's testimony is to the effect that during the time the insured worked for him he was unable to do any work on a scaffold and could do no work unless accompanied by some one; that his mental and physical condition gradually grew worse; and that during that time he had fainting spells upon five or six different occasions. After leaving the employ of Mr. Campbell he continued his vocational training with the Allen Electric Company at Danville, Ill., beginning in July, 1922, and ending on September 1, 1923. During a part of this time he was paid at the rate of 25 cents per hour, and the remainder of the time at the rate of 45 cents per hour; the increase in wages being necessary in order to comply with union rules. He earned in wages a total of $560.37 during this latter employment. His work with this company, while it extended over a considerable length of time, was very irregular; some days he would be absent all day, and at other times he would work only part of a day. The proprietor of this company, Mr. Allen, testified that he was in daily contact with him and that he could notice a gradual decline in his mental condition, and that on September 1, 1923, he refused to do the work assigned to him, and quit the employ of the company. This was the end of his vocational training. He then returned to his home and made an effort to do some wiring in the home of Mr. Dornblaser, but was unable to complete the job. Later, he attempted working for the Illinois Power & Light Company, but was unable to hold this job because of his mental condition. The last work he attempted doing was some line work for this company, extending over a period of nine days. Under the evidence, he made every effort to work and to rehabilitate himself, but his mental condition was gradually becoming worse, and he was unable to do so.

While the medical record of the insured does not extend back to the date of his discharge from military service, yet there is evidence in the record showing that he was examined by many physicians, beginning in the year 1920. The majority of these medical examinations was made by government doctors, and in each instance the insured was found to be suffering from some mental or physical ailment, or both. Dr. Williamson testified that on February 21, 1924 the insured was suffering from various ailments, among which was syphilis. Within a few days thereafter he was committed to the State Hospital for the Insane at Jacksonville, Ill. No doubt, therefore, exists as to his being totally and permanently disabled from and after the date of such commitment, because he was confined in an institution continuously from that time until his death. Dr. Gunderson testified for the government, and, in explanation of the term "general paralysis of the insane," said that it is the common designation for organic dissolution of the brain and is commonly known as paresis; that it is slowly progressive and results in a gradual deterioration of both physical and mental faculties; that at first it may be noticeable by sluggishness in speech; and that it is caused by syphilis and develops to its final stage, usually lasting over a period of years, and resulting in death.

There is substantial evidence to sustain the conclusion that, at the time of his discharge from service, the insured was suffering from an ailment of some kind which affected him both mentally and physically. At no time since his discharge was he able to work continuously without the assistance or guidance of some responsible person. The work assigned to him was usually of a light character and intended to protect him from heavy work and yet enable him to continue. Pursuant to authority given in the World War Veterans' Act (38 U.S.C.A. § 426), the Director of the Veterans' Bureau promulgated Treasury Decision No. 20 defining the meaning of the term "totally and permanently disabled" as used in the war risk insurance contract, as follows: "Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed * * * to be total disability. Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue

throughout the life of the person suffering from it. * * *"

■ The conclusion of the District Court that insured's mental and physical condition was such that he was totally and permanently disabled, as above defined, at a time when his contract of insurance was in effect, is supported by substantial evidence. •

■ It is contended by appellant that the court erred in admitting the testimony of certain lay witnesses to the effect that the insured was totally disabled at the time the insurance contract was in force. The evidence was being heard and considered by the court, not by a jury, and there is nothing in the record that justifies a conclusion that the court gave any weight to such testimony. There is sufficient evidence to support the conclusion of the court without considering such testimony. While neither a lay witness nor a medical expert should be permitted to state his conclusions upon the ultimate issue to be determined, yet any error, if any committed by the court in the instant case, was harmless and did not affect the result. See: United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617.

■ Appellant also complains of the admission in evidence of Exhibits Nos. 12 to 19, both inclusive, offered in behalf of appellees. These exhibits are found in the government file and consist of reports of the physical examinations of the insured, which are signed by government physicians in most instances. Exhibits Nos. 12 to 15, both inclusive, are examinations made after the insured was committed to the hospital for the insane, and, therefore, can have no effect upon the issues in this case. He was confined in the hospital for the insane from a time prior to such examinations until his death. Exhibits Nos. 16 to 19, both inclusive, are reports of the medical examinations made by government physicians prior to his commitment to an institution. These exhibits contain a statement of the physical findings of the physicians making the examinations, and were competent as evidence of such findings. There is no showing that the court considered any immaterial matters which may have been contained therein. Under no consideration did their admission constitute prejudicial error, and they were properly admitted in evidence. Speaking upon this subject, the Circuit Court of Appeals for the Sixth Circuit, in the case of United States v. Cole,- 45 F.(2d) 339, 341, said: "Further, we regard these reports as exceptions to the hearsay rule. They were made by the examining physicians under the sanction of official duty and as and for a permanent record of specific facts to be kept in the files of the Bureau."

See, also, Long v. United States (C.C. A.4th) 59 F.(2d) 602; see, also, Wigmore, Pocket Edition, Rules 148, 148B (1), also 148 (C).

The judgment is affirmed.