682

## UNITED STATES v. BRADEN.
### No. 7621.

Circuit Court of Appeals, Sixth Circuit.
Nov. 8, 1937.

Thomas E. Walsh, of Washington, D. C. (Horace Frierson, Jr., and A. O. Denning, both of Nashville, Tenn., and Julius C. Martin and Wilbur C. Pickett, both of Washington, D. C., on the brief), for appellant.

Lindsey M. Davis, of Nashville, Tenn., for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Suit by the guardian of Carl C. Braden upon a war risk insurance policy. The policy lapsed on October 1, 1919, unless the veteran was then permanently and totally disabled. The court denied a motion to direct a verdict for the defendant.

The principal question is whether there was substantial evidence that the veteran became totally and permanently disabled during the life of the policy.

The veteran enlisted October 9, 1917, and served until May 13, 1919, when he was honorably discharged. There is evidence tending to show that prior to enlistment his health was good, his actions were normal, and he was successfully engaged in the real estate business. He built and paid for a home worth about $8,000. The only record of disability while he was in the service is that in February, 1918, he had influenza in a French home; that he was treated for scabies from July 11 to July 14, 1918; and that he was hospitalized three days in France in December 1918, for nervousness.

On the back of his discharge appears the question: "Physical condition when discharged?" and the answer "E-x-c-e-l-e-n-t." His wife, who brought this suit as his guardian on October 3, 1932, met him in New York when he was discharged and returned with him to their home at Lewisburg, Tenn. She observed that he was then very nervous, but thought that his condition was due to the excitement of getting home. He attempted to re-enter the real estate business, but was unsuccessful. Upon his return home he began to drink and continued drinking at intervals to the extent that one of his partners complained of it, but he did not become a heavy and periodical drinker until October, 1919. He remained in Lewisburg until November, 1920, when Mrs. Braden took him to Florida for a rest. They remained there six months without any improvement in the veteran's condition. His father paid their expenses there.

Shortly thereafter they went on a visit to North Carolina and then to Knoxville, Tenn., where the veteran tried to sell vacuum cleaners, without success. After a short stay in Knoxville, they went to Birmingham, where he again unsuccessfully tried to sell the cleaners. They remained in Birmingham about nine months, and then went to Winchester, Tenn., where, from some time in 1923 to some time in 1925, he worked for his father as manager of a cedar lumber mill. He was then sent by his father to Gourley, Ala., where he remained for some time in the same business. For his services as manager, his father allowed him one-half of the profits, or about $2,700.

While in Alabama he made several trips to Hot Springs, Ark., for treatments and baths. After leaving Alabama, he and Mrs. Braden again lived in Florida for something over two years; his father paying their expenses. In 1928 he went to a government hospital and since then has spent most of his time in government hospitals. He was adjudged non compos mentis in 1929, and has since been under guardianship. It is admitted that he has been permanently and totally disabled since that time.

There is evidence tending to show that before the policy lapsed the veteran was

nervous, irritable, unable to concentrate or to enter into rational and consistent conversation; that he shunned responsibility, showed a lack of interest, and at times had a dazed expression, and that this condition grew worse up until the trial.

Appellee's claim is that the veteran was totally and permanently disabled before the lapse of the policy because of unsoundness of mind. Particular instances urged as indicating mental abnormality were: (1) That on the night of July 4, 1919, during a celebration in Lewisburg, he brandished a pistol with a threat to kill chickens; (2) that when he was called upon to speak at a banquet given to returned soldiers in 1919, he arose, yelled "Gas" and began to imitate the explosion of bombs; (3) that one night in 1924 he was awakened by the report of a gun and made an attempt to get his pistol, with the statement that "the Germans were shooting up the town and he was going to stop them;" and (4) that on one occasion two or three months after his discharge he was talking to a prospective customer who desired to sell certain land and that after telling the customer he thought it could be sold, he walked away, returned in a few minutes and began to talk about football and baseball as if he had forgotten the original conversation.

Such in the main is the evidence introduced to support appellee's contention. She introduced no medical testimony.

On December 9, 1919, the Security Mutual Life Insurance Company issued to the veteran a $5,000 life insurance policy which continued in force up to the time of the trial. On December 15, 1925, the veteran took out another policy of insurance with the Federal Life Insurance Company, but dropped it.

Dr. Grizzard, testifying for appellant, stated that in 1922 he examined the veteran on account of an injured knee, and that there was no other complaint. He was at that time under the influence of whisky.

Appellant introduced six other physicians who were specialists in nervous and mental diseases.

Dr. Stevens, the physician in charge of City View Sanitarium, an institution for the treatment of mental and nervous diseases and alcohol and drug addictions, testified that on three occasions in 1927, and two in 1929, the veteran was admitted thereto, and that he diagnosed his case each time as chronic alcoholism, but that he would classify him as a psychopath, meaning that he was a little below normal or average intelligence or self-control, but "that in spite of that he probably could be able to follow a gainful vocation, may be not that of the highest order, but self-supporting."

Dr. Laird, ward surgeon at the Veterans Hospital, Gulfport, Miss., examined the veteran while he was an inmate of that institution in April, 1930. He said nothing about his mental condition, but gave a history of the excessive use of alcohol. Dr. Laird's diagnosis was "hysteria and chronic alcoholism, but competent mentally." He thought the veteran's history and reactions indicated a constitutional psychopath by which was meant that he was inadequate, in that he had certain inherent defects which was a common type of inferiority found among people. It was his opinion that the veteran was not then suffering from any mental condition which might have rendered it impossible for him to follow some substantially gainful occupation.

Dr. McCann examined the veteran at the Gulfport hospital in 1927, and on several occasions in the Veterans Hospital at Waco, Tex. The diagnosis was the same on each occasion, i. e., that he was a man of constitutional psychopathic personality, not psychotic; that he was clear mentally unless he was under the influence of alcohol and that his nervousness was caused by alcoholism; that he was not prevented from carrying on any continuous, gainful occupation; nor was he totally and permanently disabled.

Dr. Sheeley examined the veteran in 1930, and has known him since. His diagnosis showed a "constitutional psychopathic state; inadequate personality without psychosis, with chronic alcoholism." In his opinion the chronic alcoholism was the chief factor playing a part in the veteran's condition, and that the veteran "was not suffering from any impairment of mind or body that would render him unable to follow continuously any substantially gainful occupation."

Dr. Toms, a clinical director in the Veterans Hospital of Waco, Tex., made frequent mental and neurological tests of the veteran there from June 4 to August 1, 1932, and in his opinion the veteran was suffering from "constitutional psychopathic state, inadequate personality. * * *" The second diagnosis was chronic alcoholism, and the third was hysteria. In his opinion the veteran was neither totally nor permanently disabled. Both Dr. Toms and

684

Dr. McCann testified that while he was an inmate of the Waco hospital he worked on the lawns and in the laundry; that he was a most excellent and reliable worker; that his industrial record was marred on two occasions only, when he violated his parole and indulged excessively in alcohol; that the veteran admitted that he did drink excessively during the war.

Dr. Harry Rubin, manager at the Veterans Hospital in Waco, had occasion to observe the veteran while he was an inmate there from June to September, 1932. He did not examine him, but attended the staff conferences when he was present for diagnosis. After hearing the history of the case and the diagnosis offered by the examining physician, he concurred in the conclusion that the veteran was in a "constitutional psychopathic state, inadequate personality." He was also of the opinion that he was not permanently and totally disabled, and that his condition did not prevent him from carrying on in a continuous gainful occupation.

None of the testimony of these physicians was excepted to, but certain of their statements which undertake to give their conclusions upon the whole case or upon the issue involved (U. S. v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 276, 79 L.Ed. 617) may be disregarded, and still we think a consideration of the competent testimony leads to the conclusion that there was no substantial evidence that the veteran became totally and permanently disabled while the policy was in force.

Several lay witnesses testified that during that period he was mentally incapable of following continuously any substantial gainful occupation. It is obvious that this character of testimony is of little worth, but giving to it all the weight to which, if any, it is entitled, it does not show that the veteran's unfortunate condition then became permanent. The case was peculiarly one for specialists in mental diseases, and none were offered by appellee. There is evidence tending to show that the veteran was afflicted with some mental abnormality within the life of the contract, but there is nothing to indicate that within that period his condition was incurable.

The history of the veteran's case subsequent to the lapse of his policy sheds no light favorable to appellee upon the determinative question of whether he was totally and permanently disabled before its lapse. His condition did not prevent him from procuring the life insurance policies in 1919 and 1925, or from managing his father's mills from some time in 1923 to some time in 1925, with a fair measure of success and profit. All of the specialists in mental diseases who examined him at intervals between 1927 and 1932 unite in the conclusion that chronic alcoholism was the principal element contributing to his undoing. This resulted in total and permanent disability in 1929, but his condition then carries no inference that it had progressed to such disability before the policy lapsed in 1919, although the veteran had commenced to drink heavily while he was in France.

For the reasons indicated, the judgment is reversed and the case remanded for a new trial.

 Error is assigned upon the action of the court in excluding from the jury Exhibits Nos. 1 and 2. These exhibits purport to be photostatic copies of the applications of the veteran for the insurance policies issued to him by the Security Mutual Life Insurance Company and the Federal Life Insurance Company. Their appearance indicates that the original applications were signed by the veteran and contain answers to certain questions which appellant regards as relevant to the issues involved, but no excuse was given for the failure to introduce the original applications, and there was no evidence that the purported copies were really copies thereof. There was, therefore, no error in excluding them.