**Kate T. LAIRD, Plaintiff,**

v.

**Abraham A. RIBICOFF, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 2962.**

United States District Court
W. D. South Carolina,
Anderson Division.

May 7, 1962.

W. K. Charles, Charles & Charles, Greenwood, S. C., for plaintiff.

John C. Williams, U. S. Atty., Charles Porter, Asst. U. S. Atty., Greenville, S. C., for defendant.

MARTIN, District Judge.

This action was brought pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C.A. § 405(g)), to review a final decision by the Secretary denying disability benefits under the Social Security Act. Plaintiff has not worked since September 10, 1958. On January 9, 1959, plaintiff filed applications for disability insurance benefits and to establish a period of disability. Plaintiff has exhausted her administrative remedies including a hearing before a hearing examiner and the denial of review by the appeals council.

Plaintiff was born in 1903. She did not complete the sixth grade in school and has no other training of any type. After quitting school in the sixth grade, plaintiff got a job in a textile mill in Ninety-Six, South Carolina, as a spinner and thereafter worked as a spinner in the towns of Pelzer and Williamston, her last employment being in the Mt. Vernon Mill, Williamston, South Carolina.

Plaintiff is a widow and now resides with her married son, his wife and their three children. The son is the only working member of the family. Until her mother's death in December 1959, she and her mother lived together and, from December 1959 until her son moved in with her, she lived with her aunt.

Plaintiff testified that she was forced to stop working in the mill because of her health. She testified that several months prior to the date she stopped working she would have "black-out spells" and would be forced to sit down. The first seizure or "black-out" occurred in 1957. In the early part of 1958, Plaintiff suffered another seizure while

working and sustained several at home which caused her to fall down. In September 1958, plaintiff again had a seizure while working and as a consequence thereof she was taken to the mill nurse's office and from there to her home. She saw Dr. Ewing the next day and received treatment. She remained at home for approximately two weeks and then attempted to return to her work but her employer refused to permit her to resume her employment.

She then applied for unemployment compensation and received two payments but did not apply for compensation after that because she considered herself unemployable and therefore not eligible for benefits. In March of 1959, she applied for welfare assistance and began receiving benefits in November of 1959.

After she was not permitted to return to work in the mill, plaintiff applied for work in a shirt and blouse factory in Williamston and for a job as a waitress but was not successful in obtaining either job.

The plaintiff testified in relation to her physical condition that she had high blood pressure and a bad heart; that she was not able to walk for any distance and was not able to stand for any length of time; that she had trouble with her eyes and could see very little; that she had shortness of breath and was unable to do any housework. She also testified that she had trouble with her remaining kidney in that it "moves more often" and had pain in her back.

The medical evidence in this case consists of tests, clinical findings and statements by several doctors as follows:

Reports from B. R. Ewing, Anderson, S. C.; Dwight H. Smith, Williamston, S. C.; L. C. Bailes, Anderson, S. C.; and Phillips L. Bates, Greenwood, S. C.; also copies of records of claimant's treatment at Williamston Hospital and at Anderson Memorial Hospital, and a copy of hospital records of her treatment February 14, 1960, and July 25, 1940. There is also a report from H. B. Odom, Optometrist, Greenwood, S. C.

The following is a summary of the medical evidence:

The earliest medical evidence is the records of the treatment plaintiff received for carcinoma cervix uteri, grade IV, group III, between February 14, 1940, and July 25, 1960. The records show that the plaintiff was treated with radium and that over a period of time her condition improved.

A report from the Anderson Memorial Hospital, dated May 29, 1958, shows that a vaginal examination revealed no residual disease and that at that time she was treated for spastic colon and mild hypertension.

B. R. Ewing, M. D., one of the plaintiff's doctors, has submitted two reports. The first report, dated January 13, 1959, shows that plaintiff's height was 64 inches and her weight at the time of the report was 107 pounds; that the diagnosis was severe hypertension; that she was ambulatory and that the restriction on her activity is shown as limited exertion; that her blood pressure was 210/130; that she had no respiratory, arthritic, neurological or visual impairments at that time. A second report, dated December 13, 1960, shows that the doctor is of the opinion that claimant has severe, brittle hypertension which responds very little to medication; that she had a left nephrectomy in 1931; that he feels "Nephrocelerosis" and arteriosclerosis in the basis of her hypertension and expressed the opinion that her hypertension is severe, permanent and renders her incapable of gainful work.

Dwight H. Smith, M. D., who has treated plaintiff has submitted three reports. One is dated January 26, 1959, one January 29, 1960, and one December 12, 1960. In his first report this doctor shows a diagnosis of hypertensive vascular disease with cerebral accident; that he first saw claimant September 1958 and last examined her January 26, 1959; that her blood pressure was 260/120 and that she had left hemiplegia, presumably at the time of examination. In the second report, dated January 29,

1960, this doctor shows, in pertinent part, the following:

"For the past six months this patient has been treated for severe chronic pyelonephritis, right. Her urinalysis even with treatment shows about 2–30 pus cells/HPF. Before treatment her urine specimen contained 100–110 WBC/HPF. She has been receiving various antibiotics now for about six months. Her blood pressure ranges from 190/100 to 230/120. Her Hemoglobin ranges from 60% to 70%. It is estimated that this patient has about 50% function in her one remaining kidney."

In his third report he states the following:

"This is to certify that Mrs. Kate Turner Laird is totally and permanently disabled to do any type of work, due to severe hypertensive renal disease due to chronic pyelonephritis right. Due to the fact that patient has only one kidney, the prognosis is very poor. This patient has been treated since 1933 following the removal of her left kidney. Complete bed rest is very essential to protect her from developing additional hypertension and further embarrassing her one remaining kidney. This patient was treated with radium in 1941 for cancer of the uterine cervix."

The medical report, dated March 17, 1959, by L. C. Bailes, M. D., shows that the plaintiff had a marked kyphosis of the dorsal spine which caused the plaintiff to tend to tilt to the right with a flattening of her lumbar curve; that there was a moderate amount of stiffness of the lower back but that this condition did not limit motion; the eyes were found to be normal but there was some narrowing of the fundi and torturosity with AV constriction of the arterios but otherwise within normal limits. The heart was found to be normal in size, shape and slightly rapid but no murmurs were heard. The lungs were found to be clear. Nodular thickening of the distal joints of the fingers were found which resulted in very slight limitation of motion. Dr. Bailes gave his impression as follows: "(1) Chronic anxiety state. (2) Hypertensive cardiovascular disease, well compensated. (3) Dorsal kyphosis with early osteoperosis and a postural low back pain."

The psychiatric evaluation report of May 6, 1959, by Roy J. Ellison, Jr., M. D., shows that the plaintiff's condition was diagnosed as follows: "Anxiety reaction, chronic, moderate to marked."

The medical report of August 22, 1959, by W. F. Lumus, M. D., shows that plaintiff was found to be suffering from hypertension; that her heart was not enlarged; that her blood pressure was 180/100; that there was dyspnea on moderate activity but no angina and no edema; that the examination as to her arthritic, neurological and visual condition was negative."

The hospital record covering the period from April 3, 1960, to April 7, 1960, shows the final diagnosis as "Essential hypertension. Irritable Colon." The physical examination of the plaintiff conducted during her hospital stay revealed the plaintiff's blood pressure to be 180/74. An examination of the plaintiff's eyes revealed a Grade 2 arteriosclerotic changes in the eye grounds, but they were otherwise normal. The lungs were clear; the heart was not enlarged with no gallop and no murmur; urine was found to be within normal limits. The plaintiff was treated for her hypertension and was discharged improved.

The report of March 30, 1960, by C. B. Bowie, M. D. reveals that the plaintiff's heart was found to be essentially normal; that her blood pressure was 180/100; that Intravenous Pyleograms were made which showed that the plaintiff's remaining kidney did not contain any stones, that there was proper function of the kidney and that it was normal. The physician's impression was as follows: "Hypertension, severe; marked spastic colitis, from the history of the solitary right kidney."

The report of the optometrist, H. B. Odom, dated December 15, 1960, shows that her vision was found to be correctable to 20/40 in each eye.

The report by P. L. Bates, M. D., based on an examination made on December 19, 1960 for her renal function, showed that there was no reduction in renal function due to her hypertension nor was there any evidence of a relation between the hypertension and any renal or super renal diseases. It showed that the right kidney was slightly enlarged in size compatible with a compensatory hypertrophy; that the blood uria nitrogen was within normal range; and that there was a normal upper urinary tract on the right. In short, this examination shows that claimant either had no chronic pyelonephritis of the right kidney or it was not of impairing severity and that she had no severe hypertensive renal disease.

There is some conflict in the medical evidence, but a fair survey of the evidence as a whole shows that the plaintiff has severe hypertension; has Hypertensive Cardiovascular Disease; has only one kidney; has poor eyesight, correctable to 20/40; has marked kyphosis of the dorsal spine and is thereby caused to tilt to the right; osteoporosis; stiffness of the lower back; nodular thickening of the distal joints of the fingers with slight limitation of motion; has a history of cancer; and suffers from dyspnea on moderate activity. In addition, the psychiatric evaluation reveals that the plaintiff suffers from an anxiety reaction, chronic, moderate to marked.

In support of her contention that she is disabled within the meaning of the statute, the plaintiff relies primarily on her own testimony and on the reports submitted by her own physicians, Smith and Ewing.

Both doctors were of the opinion that the plaintiff was disabled to do any type of work. Dr. Ewing said: "It is my opinion that her hypertension is severe, permanent, and certainly renders her incapable of gainful work." He also said

the plaintiff frequently had anginal pains.

Dr. Smith said that the plaintiff was unable to engage in any type of work because of severe hypertensive renal disease. "Complete bed rest is very essential to protect her from developing additional hypertension and further embarrassing her one remaining kidney."

The findings of Doctors Smith and Ewing relating to the plaintiff's heart and kidney are contradicted by the findings of the other doctors and by the clinical findings in evidence.

Admittedly, the plaintiff has severe hypertension. The question is whether this condition alone or in combination with the other impairments found to exist above renders the plaintiff disabled within the terms of the act.

In order to be "disabled" within the terms of Sections 216(i) and 223 of the Social Security Act, 42 U.S.C.A. §§ 416 (i), 423, the plaintiff must prove "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

The Secretary found that the plaintiff " * * * failed to show that she was rendered continuously unable to engage in any substantial gainful employment, because of a medically determinable physical or mental impairment, at any time prior to and including the date she filed her application for disability benefits," and decided that the plaintiff is not entitled to have a period of disability established under section 216(i) of the Act as amended [42 U.S.C.A. § 416] and is not entitled to disability insurance benefits under section 223 of the Act, [42 U.S.C.A. § 423].

■ If there is substantial evidence in the record to support the finding of the Secretary, the District Court cannot set it aside. 42 U.S.C.A. § 405(g). "If there is only a slight preponderance of evidence on one side or the other, the Secretary's finding must be affirmed "

Underwood v. Ribicoff (4th Cir. 1962) 298 F.2d 850, 851.

The factors to be considered in determining whether a plaintiff is disabled within the meaning of the statute were set out in the recent case of Underwood v. Ribicoff, supra, where the court said at page 851:

"In this case, there are four elements of proof to be considered in making a finding of Claimant's ability or inability to engage in any substantial gainful activity. These are: (1) the objective medical facts, which are the clinical findings of treating or examining physicians divorced from their expert judgments or opinion as to the significance of these clinical findings, (2) the diagnoses, and expert medical opinions of the treating and examining physicians on subsidiary questions of fact, (3) the subjective evidence of pain and disability testified to by Claimant, and corroborated by his wife and his neighbors, (4) Claimant's educational background, work history, and present age.

"For the purpose of making a finding of fact on this issue, the fact finder must recognize the obvious interrelation of these elements of proof. The objective medical findings may show more or less clearly the existence of certain clinically determinable physical or mental impairments. However, a recitation of objective, clinical findings will seldom show, without more, the overall effect of these impairments on a particular individual. This is a matter of medical judgment to be decided with reference to the individual's general physical condition and the state of development of each of the defects. The expert medical opinion of treating or examining physicians on these subsidiary questions of fact will in most cases be essential in determining with respect to a particular individual the severity of an objectively determinable physical impairment. This subsidiary question of fact is distinguishable from the ultimate question of fact in issue in the case.

"The ultimate fact in issue; that is, Claimant's ability or inability to engage in any substantial gainful activity, is not to be resolved, however, solely on the basis of medical opinion evidence as to this ultimate fact. Opinion evidence on this issue is without weight. United States v. Spaulding, 293 U.S. 498, at 506, 55 S.Ct. 273, 79 L.Ed. 617 (1934). This is a matter for administrative determination. * * *"

Applying the principles set forth in the Underwood case to the facts in the present case, the conclusion that the Secretary's decision must be affirmed is inescapable.

The fact that the plaintiff had hypertension and other impairments were shown by clinical findings, thus satisfying the first requirement of the Underwood case but there was no medical evidence to show how the impairments affected the plaintiff. The plaintiff's doctors were of the opinion that the plaintiff was disabled, but this opinion goes to the ultimate fact and does not show why she was disabled. Clearly the plaintiff did not meet the second principle set out in the Underwood case.

The plaintiff also failed to meet the third requirement of the Underwood case. The plaintiff testified as to her pain and disability but the Secretary did not believe her. She failed to corroborate her disability by testimony of her relatives and neighbors. One neighbor did testify in the plaintiff's behalf, but her testimony was so general and uncertain as to be of no value. In the absence of corroboration of the plaintiff's testimony by other persons, the Secretary could refuse to believe her.

The decision of the Secretary is hereby affirmed, and

IT IS SO ORDERED.