## WILNER v. UNITED STATES.

No. 6015.

Circuit Court of Appeals, Seventh Circuit.

Dec. 30, 1936.

Rehearing Denied Jan. 23, 1937.

Edward H. S. Martin, of Chicago, Ill., for appellant.

Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Michael L. Igoe, U. S. Atty., of Chicago, Ill., and Wilbur C. Pickett, Randolph C. Shaw, and Fendall Marbury, Sp. Assts. to the Atty. Gen.

Before SPARKS, Circuit Judge, and LINDLEY and BALTZELL, · District Judges.

BALTZELL, District Judge.

This is an action in which appellant seeks to recover upon a war risk insurance contract. The insured, Meyer Wilner, was inducted into the United States Army on September 19, 1917, and was honorably discharged therefrom on March 31, 1919. During the time he was in the military service he made application for, and there was issued to him by appellee, a war risk insurance contract in the sum of $5,000. The premiums on this contract were paid by the deduction of the amount thereof from his pay each month until the date of his discharge, after which date no further premiums were paid. Allowing for the days of grace, his insurance remained in full force and effect until May 1, 1919, at which time it lapsed for nonpayment of premiums, unless upon that date he was totally and permanently disabled.

The case was tried to a jury, and, at the conclusion of all the evidence, the District Court directed a verdict in favor of appellee, upon which verdict judgment was afterwards rendered. The only error assigned is the action of the court in thus directing a verdict. The only question presented for determination by this appeal is, therefore, whether or not there was substantial evidence to sustain plaintiff's position which required the case to be submitted to the jury.

At the time Meyer Wilner (hereinafter referred to as the insured) entered the military service he was a young man in good physical condition. He was in the service only a few months until he went overseas and saw active service at the front. On August 4, 1918, he was injured by a high explosive shell to such an extent that it became necessary to amputate his left leg at a point approximately three inches above the ankle. He received other injuries at that time from which he fully recovered. He was taken to a hospital for treatment, and thereafter received treatment in various hospitals prior to his discharge, both in France and in the United States. The records disclose that the wound had nearly healed on October 11, 1918, was fit for use, and that he had a short time prior thereto been supplied with a peg leg. The records of the hospitals in which he was confined show that he continued to improve until November 23, 1918, on which date he fell, striking the stump and reopening the wound. He received treatment for this injury, and the wound again healed. On February 25, 1919, he was at Camp Upton, and his condition while there was good. He was then wearing a temporary artificial leg, and was so wearing this leg at the time of his discharge. He was discharged from this camp on March 31st following, when, according to the records, his condition was good, although, in view of his occupation, he was said to be partially disabled.

The insured was a shoe salesman prior to his entering military service, and was employed by appellant, his brother, in his shoe store. Shortly following his discharge, he applied for, and was granted, compensation, because of the disability which he suffered while in service. He was paid compensation continuously from the date of his discharge until the date of his death, except while he was in vocational training, during which time he received $80 per month part of the time, and $100 per month the remainder of the time. The amount of compensation paid ranged from $44 per month to $80 per month. In making the physical examination of insured for compensation purposes in April, 1919, the stump was found to be well shrunken and was neither tender nor painful. The scars were well healed. Insured was a single man, making his home with appellant and assisting him in his shoe store, although doing very little work at that time.

The evidence, in addition to a few lay witnesses and several doctors, consists of records compiled at hospitals where insured was confined for treatment. In October, 1919, he complained of the stump being sore, and was given treatment in a government hospital for a few weeks and discharged on December 1st. The records of the hospital show that the stump was in good condition and the sore healed at that time. He entered vocational training within a few days after his discharge from this hospital, and continued in this training for almost two years. He had desired vocational training for several months prior to his entrance in such training, and stated that he had no complaint, except the discomfort suffered by the loss of his foot. The training first consisted of tailoring, then of elementary commercial work, and later of salesmanship, and terminated at his own request on October 31, 1921, the records showing that he was rehabilitated and intended to engage in his prewar occupation of shoe salesman. He returned to his brother's home and did assist him some as a salesman in his shoe store, although his brother and niece testified that he received no wages for his services and that he paid nothing for his board and room. During the next few years he complained occasionally of the stump being painful, especially on hot days. He was examined periodically for this complaint, and was finally admitted to the United States Veterans' Bureau Hospital at Maywood, Ill., on July 3, 1923. At this time there was a discharging sore on the stump, which had been there only a short time. An operation was performed for the purpose of relieving this condition on July 23d, and the insured remained in the hospital until January 4, 1924. In the meantime he had been supplied with a well-fitting artificial leg which he wore without inconvenience or trouble. Later, a small ulcer appeared upon the stump, and he returned to the Maywood Hospital in February, 1924, where he received further treatment, re-

maining there until March 10th of that year. The treatment thus administered produced satisfactory results, and from then until the time of his death he had no serious trouble with his leg. In fact, no further treatment was necessary, and he wore his artificial leg without discomfort thereafter.

While it is true that both appellant and his daughter, who was less than thirteen years of age at the time insured was discharged from the Army, testified that from the time of his discharge he had been nervous, irritable, and often vomited after his meals, yet their testimony is also to the effect that his major disability was caused by the loss of his leg. Rose Lambert testified that she had known insured since his discharge from the service and that she had visited in the home of his brother. She had seen him become ill at the table, excuse himself, and retire to another room and vomit. This, she testified, occurred in 1926, 1927, and 1928, but she was certain it did not occur prior to 1922. The report of a physical examination made of insured at the Edward Hines, Jr., Hospital, under date of November 26, 1928, discloses that insured gave a history of having had very little trouble with his leg since 1924, but that he had suffered from very severe aches and pains in his stomach and abdomen about two weeks prior to the date of such examination, and that such pains were accompanied with vomiting, and that they had not cleared up. A further examination was made of him at the same hospital, begun January 23, 1929, and ended February 21, 1929. It was found that he was suffering from cancer of the stomach, from which disease he died on May 15, 1929.

In addition to the testimony of the three lay witnesses for plaintiff, Drs. Beebe and Stutz testified as experts in answer to a hypothetical question addressed to them. The opinion of these witnesses, as to the ability of insured to work during the time in question, is of no value to the court, in view of the recent decisions of the courts. See United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; United States v. Sparks (C.C.A.) 80 F.(2d) 392.

There were three doctors who had examined insured and who testified for the government. Dr. D. J. Margolis examined him upon two occasions, the first being on July 3, 1923, and the second being on December 8, 1924. The first examination was made at the home of insured because an infection was developing at the end of the stump which prevented him from coming to the office. In the opinion of Dr. Margolis, the insured was able to work upon the occasion of each examination. Dr. B. F. Ward, a specialist in orthopedic surgery, examined insured on February 19, 1924, at which time he had an open sinus or ulceration at the end of the stump leading down into the tissues. At the time of this examination he was not able to work, but could do work as a shoe salesman as quickly as the sinus healed. Dr. Ward examined insured again on December 8, 1924, at which time, he testified, the stump was healed and insured was wearing an artificial limb. It was his opinion that he could follow his usual occupation of shoe salesman at that time. On the same date insured was also examined by Dr. W. A. Danielson, who was also a specialist in orthopedic surgery, and in whose opinion he was able, at that time, to work as a shoe salesman, or at any other job in which he would not be required to be on his feet all of the time.

There is no doubt, under the evidence, but that insured was partially disabled continuously from the time of his injury until his death. For this partial disability the government compensated him. There must, of course, be more than partial disability before one can recover in an action upon a war risk insurance contract. There must be substantial evidence that insured was totally and permanently disabled at a time when such contract was in force, which was, in the instant case, on or before May 1, 1919. In the absence of such substantial evidence, it was the duty of the court to direct a verdict for the government. Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977; United States v. Spaulding, supra; Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492. The language used by this court in the case of United States v. Becker, 86 F.(2d) 818, decided on December 8, 1936, that "the evidence is such as to leave entirely to speculation and conjecture the degree of disability at the requisite time. This is true of both the medical and lay evidence. Consequently there was nothing for the jury except speculation. Such is not sufficient. United States v. Krueger, 77 F.(2d) 171 (C.C.A.7); Deadrich v. United States, 74 F.(2d) 619 (C.C.A.9); United States v. Burns, 69 F.(2d) 636 (C.C.A.5); United States v. Brown, 76 F.(2d) 352 (C.C.A.1)," is applicable in the instant case.

A careful examination of the evidence convinces us that there is no substantial evidence which would have justified the

submission of the case to the jury, and that the court properly directed a verdict for appellee.

The judgment of the District Court is affirmed.