## GOBLE v. UNITED STATES.
### No. 6311.

Circuit Court of Appeals, Seventh Circuit.
Dec. 17, 1937.

Rehearing Denied Feb. 8, 1938.

Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., Kenneth E. Spencer, Atty., Department of Justice, of Washington, D. C., James R. Fleming, U. S. Atty., of Fort Wayne, Ind., Luther M. Swygert, Asst. U. S. Atty., of Hammond, Ind., Alexander M. Campbell, Asst. U. S. Atty., of Fort Wayne, Ind., and Fendall Marbury, of Washington, D. C.

Clarence E. Benadum, of Muncie, Ind., for appellee.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

This is a war risk insurance case. The Government appeals from a judgment based upon a verdict in favor of the veteran. The jury found him totally and permanently disabled on February 15, 1919, the date of his discharge.

EVANS, Circuit Judge.

Goble enlisted January 5, 1918. He was honorably discharged February 15, 1919. His policy lapsed April 1, 1919, and his claim was filed June 25, 1931. Suit was begun May 28, 1935.

Plaintiff has suffered since his war service from psychoneurosis (weeping spells). Aside from this extreme nervous disorder he has had a thyroidectomy; duodenal ulcer; low blood pressure; irregular pulse; paralysis resulting from thrombosis; arrested tuberculosis; pneumonia (while in service); and myocarditis. He was gassed while in active service.

Plaintiff's work record is long and varied and covers many capacities, but all employments were of short duration—a few days, weeks, or months. His remuneration was frequently merely a pittance.

Defendant's sole contention is that there is no substantial evidence to support the jury's finding.

Plaintiff has been under medical supervision or physicians' treatment at frequent intervals since leaving the service. In November, 1918, he was confined in the base hospital with pneumonia. He had been gassed. In 1922, Dr. Connelly found the veteran to have a peptic ulcer, low physical condition and neurasthenia. In March, 1922, he was in the Government hospital in Marion, Indiana (he was there three different times), and remained three months. He underwent a tonsilectomy and was also found to be suffering from enlarged thyroid and neurasthenia. Later he was at a hospital in Dayton for a month. He had a thyroidectomy. In June, 1922, he was advised to see a tuberculosis and a neuropsychiatric specialist. Another physician at the same time found him to be suffering from thyroiditis, chronic, and myocarditis, chronic, mild. Prognosis, questionable. In the same month another specialist found him to be suffering from dementia praecox. Numerous other specialists found the same highly nervous condition which persisted. In addition some examinations showed myocarditis, old duodenal ulcer, disturbed sensations in limbs probably due to cerebral thrombosis, and dementia praecox.

It may be inaccurate to classify weeping spells as a permanent and total disability. We are not the triers of fact, but merely reviewers of the action of the triers and limited in our investigation to an ascertainment of the existence of substantial evidence sufficient to support the verdict.

Weeping spells are not the only affliction from which this man suffered. It is likely

that these "weeping spells" were merely an outward manifestation of a deeply rooted and serious nervous malady. The evidence is quite clear that these spells would sometimes occur two or three times a week, sometimes less frequently. No relief has been found. They would last sometimes a half hour, other times an hour, and would be followed by a highly nervous condition. They evidenced a mental disturbance which seemingly could be neither cured nor alleviated. The spells arose without provocation, and neither sympathy nor assistance brought relief, but rather intensified the condition.

Dr. Baskett testified:

"He had these crying spells that were certainly not normal. He would have them for apparently no reason at all while he was sitting talking to me. They were uncontrollable. He would go all to pieces. This mental condition was chronic."

Dr. Kaler said:

"He would burst out crying for no apparent reason."

His sister-in-law testified:

"I stayed there about four days and he had two of those crying spells during that time. I have known him to cry for an hour and pretty hard for half an hour; you could not do anything with him."

Goble's wife testified:

"When he had those crying spells he would just quiver and shake all over and cry and the more you talked to him, the worse he would get * * *. He had those spells in the night, would be out of his head and talk about things that never existed."

His mother-in-law testified:

"He would seem like he was almost in convulsions during those crying spells and would wring his hands—almost pull his hair at times—was so nervous he would shake and tremble all over."

There was other evidence of mental and physical disability which need not be restated as it was cumulative in character.

His work record was excellent. It disclosed a willing artisan who earned enough, at various simple occupations, to defeat any finding of total disability in the absence of the disabilities just mentioned. Were it not for the persuasive evidence of mental (nervous) disabilities and bodily ailments we would be compelled, on the work record, to reject the jury's finding of total disability as lacking in evidentiary support.

However, running through this work testimony is an inescapable expression of human sympathy of employers for an unfortunate employee; of a sense of human obligation of the strong towards the weak, awakened by commiseration for wife as well as for the veteran. We are convinced that compensation for services was paid at times when not fully earned. Employment was also given at times for reasons other than ability of plaintiff to render the needed services.

If we were to accept defendant's testimony and theory of this case, rejection of the finding in plaintiff's favor would be prompt and decisive. Even when we reject all of defendant's testimony which is either directly or indirectly disputed, or out of harmony with the statement of plaintiff's witnesses, and when we place the most liberal construction possible upon his testimony, it is still not easy to reconcile the facts with a finding of total and permanent disability in April, 1919. It is extremely difficult to reconcile the wife's assertion of his mental disturbance and physical disabilities with the fact of her marriage to him. Moreover, his earnings are somewhat out of harmony with a finding of total disability. Then, too, there is sufficient conflict in the medical reports to convince us that the severity of some of his aches and pains may be overstated by him and his near relatives. What has resolved the issue in his favor is the evidence of loss of *mental* control, the origin of which may well be traceable to his war experience. These mental weaknesses manifested themselves shortly after he was discharged. As to their existence there is abundance of proof even as early as the first few months after his discharge, although failure to detect mental disturbances may be more readily excused or explained than the non-discovery of physical afflictions.

■ We are convinced that we have before us a border-line case. So involved is the fact issue, that we are unable to say is so free of doubt that we cannot accept the verdict of the jury. Such being the situation the trial court properly submitted the question to a jury. The latter's verdict may not, under the circumstances, be disturbed by us.

The judgment is affirmed.