## WITMER v. UNITED STATES.
### No. 6377.

Circuit Court of Appeals, Third Circuit.
April 29, 1938.

Charles F. Uhl, U. S. Atty., and Stanley Granger, Asst. U. S. Atty., both of Pittsburgh, Pa., Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Young M. Smith, of Washington, D. C., Atty., Department of Justice.

Samuel Kaufman, of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

DAVIS, Circuit Judge.

In a suit on a war risk insurance policy, the plaintiff, Witmer, recovered judgment in the sum of $5,757 against the government on a verdict of a jury. From this judgment the government has appealed.

The government contends that the District Court committed two errors, one by denying its motion for a directed verdict and the other by permitting an expert witness to testify that in his opinion the plaintiff was totally and permanently disabled in 1920.

Both of these contentions may be disposed of by a careful consideration of the merits of the case. Even though we may consider the admission of the opinion testimony as erroneous (see United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617), "where the judgment is clearly correct upon the merits, intervening errors will not operate to reverse the judgment." 5 C.J.S. 805, Appeal and Error, § 1676; 28 U.S.C.A. 391 (see note 121); McLanahan v. Universal Insurance Co., 26 U.S. 170, 1 Pet. 170, 7 L.Ed. 98; Miller v. Maryland Casualty Co., 2 Cir., 40 F. 2d 463. And, if this case was correctly decided upon the merits, the District Court obviously committed no error by refusing to direct a verdict for the government. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720.

The only question involved therefore is whether or not, on all of the facts of this case, the plaintiff was entitled to the benefits of his policy of war risk insurance. This may be resolved into the question of whether or not the plaintiff's work record is such as conclusively to negative a finding that the plaintiff was totally and permanently disabled prior to the expiration of the policy.

The facts are as follows: The policy was in effect between January 1, 1918, and November 1, 1920. During that period on September 29, 1918, the plaintiff, who theretofore had been in good health, while in active service was shot through both legs by machine gun bullets. He lay on the battlefield for seven hours before he was picked up and given first aid. From then until some time in February, 1919, he was in army hospitals in France. It was found that gangrene had set in and the wounds had to be kept open for drainage. During this period, a condition formed on the heel of his right foot, which was then diagnosed as a burn caused by a hot water bottle. Evidence at the trial, however, indicates that the diagnosis was wrong, and that the flesh or skin was sloughing off at the heel, due to an injury to the sciatic nerve. He was then taken from the army hospital in France to a debarkation hospital in the United States in the State of Virginia, where he gradually regained some of his strength and ability to walk. His injuries, however, had not been completely cured, for in the spring of 1922 he was in Hammett hospital for the removal of a growth on his right heel, and in the fall of the same year he was in the West Penn hospital, where skin was grafted on to the same heel. In 1924, he was in the United States Naval

Hospital in Philadelphia, where another growth was removed from his right heel. It also appears that the plaintiff, even up to the present time, has very frequently sought medical advice and treatment for these injuries.

Interspersed with these visits to the hospital, the plaintiff did some work, which, the government contends, clearly negatives any finding that the plaintiff was totally and permanently disabled prior to November 1, 1920.

From August, 1920, to April, 1921, he worked 1,934 hours for the National Transit Pump & Machine Company, receiving $837.90 in salary. During this period, the evidence indicates that he was in constant pain and finally had to quit the job.

In July, 1921, after a period of rest, he again attempted to work. This time he tried vocational training in a garage, and managed to work until August, 1922. The foreman of the garage testified that the plaintiff could not effectively do the work but that out of sympathy for his condition he kept him on. Part of this period was spent in Hammett hospital for the removal of the growth on his right heel, as above stated. Finally the plaintiff had to give up this work also due to the pain and suffering especially in his right leg and foot, due to the injury to the sciatic nerve.

From August, 1922, until April, 1925, he did not work. In 1923 he had been refused further vocational guidance as a gas engine expert, because of his physical condition.

In April, 1925, he obtained work as a machinist for the Oil Well Supply Company, and he managed to hold this job until August, 1930. Even here, however, he could not work steadily, and from August, 1929 to February, 1930, he did no·work. One of his coemployees testified that pain was apparent on the plaintiff's face; that 90 per cent. of the employees helped him with most of the hard work required of him, and that he was apparently "working on his nerve." Other evidence indicates that the plaintiff could not bear any weight on his right heel and that he had to walk on the forepart of his foot; that he was in constant pain; that he suffered from cramps and swellings in his right leg; that he suffered insomnia; that he is now to-

tally and permanently disabled; and that his entire nervous system has been undermined.

The evidence in this case is clearly sufficient to support the verdict in favor of the plaintiff. It tends to show that the plaintiff's disability is permanent, for he has never recovered from the injuries received in battle, and any cure for him is highly improbable. The evidence also established that at the time of the trial he was totally and permanently disabled.

This leaves open the question of whether or not his disability was total throughout the period from November, 1920, until the trial. Though a superficial consideration of the plaintiff's work record would make it seem inconsistent with the allegation of total disability at that time, this apparent inconsistency disappears when all of the circumstances surrounding the work record are considered. To restate some of these briefly, when he was working in the garage, he was kept on, not because he was able to do the work required of him, but out of sympathy for his condition. When he was working for the Oil Well Supply Company, his coemployees, taking pity on him because of his condition, did practically all of the strenuous work for him. They saw that he was "working on his nerve," and his pain was written on his face. "Running through this work testimony is an inescapable expression of human sympathy * * *; of a sense of human obligation of the strong towards the weak." Goble v. United States, 7 Cir., 94 F.2d 275, 276. He suffered from cramps, insomnia, and was in constant pain. He could not even walk normally. He underwent several operations in an attempt to cure his disability but was finally advised against any further operations. He continually sought medical treatment. He was refused further vocational guidance because of his physical condition. All of these hardships are directly attributable to the injuries received in the service of his country. They indicate that the plaintiff worked "when really unable and at the risk of endangering his health or life." Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 276, 78 L.Ed. 492. He is therefore entitled to the benefits of his policy of war risk insurance, Lumbra v. United States, supra; United States v. Caldwell, 3 Cir., 69 F.2d 200, and the judgment is affirmed.