## UNITED STATES v. KUSCH.

### No. 8047.

Circuit Court of Appeals, Sixth Circuit.

April 12, 1940.

Wilbur C. Pickett, of Washington, D. C. (John C. Lehr and Francis X. Norris, both of Detroit, Mich., and Julius C. Martin, Wilbur C. Pickett, and Thomas E. Walsh, all of Washington, D. C., on the brief), for appellant.

Rowland W. Fixel, of Detroit, Mich., for appellee.

Before ALLEN, HAMILTON, and ARANT, Circuit Judges.

ARANT, Circuit Judge.

This is an appeal from a judgment upon a war risk insurance policy. The sole issue below was whether the insured became permanently and totally disabled, thereby maturing the policy, before it lapsed for nonpayment of premiums, on January 31, 1919. Appellant moved for a directed verdict when appellee rested, and again at the close of all the testimony. After verdict, appellant made a motion, that the verdict be set aside and a new trial granted. Denial of these motions and the admission of certain evidence are assigned as errors.

The insured entered military service on September 21, 1917. He received a gunshot wound in his right forearm, on October 17, 1918, and was hospitalized until January 12, 1919, when his wound was described as healed. He was discharged from service on January 16, 1919; his policy lapsed for non-payment of premiums at the end of the month; and his death occurred May 23, 1929.

No claim that he was totally and permanently disabled was ever made by insured during the ten years he lived after discharge from military service; nor was any suit asserting such claim brought until October 15, 1931, almost two and a half years after

insured's death, when appellee, his sister, as administratrix of his estate, and his mother, as beneficiary under the policy, brought this suit. The mother died pending trial, and appellee, as administratrix of her estate, was substituted as a party plaintiff.

The only direct testimony on behalf of appellee, other than medical, was her own, as follows: " * * * I recall when he [insured] went in the service and I remember when he came back, he still had a uniform on when I first saw him. He came right to the house. He went back to Camp Custer I think on account of his arm, then he came back home, after he was discharged. Before he went back to Camp Custer I observed he was a changed man altogether. He wasn't the man he left to the war. His face was bloated and red and he had sores on the side of his cheek and his ear and his arm. *After he was home,* he didn't act like himself at all. He was excited all the time, and it seems his face showed he had pains all the time. You could see it on his face. He exclaimed about his pain often to me, but you could notice on him he was in pain. *It was shortly after he came back—in a couple of weeks or so.* I couldn't look at the wound on his arm. I just glanced at it. It was an awful wound. I never cared to look at it. Very little flesh left on the arm. It looked like a big cavity. All you could see, mostly, was part of the bone. There was skin over the bone. That was on the right forearm. *After he came back he did nothing.* He tried to cut the lawn and tried to take care of the furnace. He would stop in the middle of what he tried to do. This was shortly after he came back. I saw him try to lift things. I observed his appetite was no good. After he would eat he would vomit anything he had eaten. He moved very slow—just walked around. After he came back I spent nights at the house. I used to keep him company. He couldn't sleep nights. At that time when I got up during the night it was more than one occasion, most of all we were up with him until late at night. Mother stayed with him most of the nights. He didn't sleep at all. Very, very little. When he tried to sleep he would get up and swing his arm. It was pitiful to watch him. I saw him doing that. He made exclamation about the arm hurting him; he said 'my arm aches me terribly.' I observed he didn't sleep. I lived two blocks away from my mother and he would come and just drop on the rocker. That is how tired he was and he breathed as though he couldn't get no air—had difficulty in breathing. He started to take vocational training shortly after he came back. They were trying to qualify him for a draftsman. He had at the house to work on a board and the paper which he was drawing, or the blue print, and he would work around, go along, just about a couple of minutes and throw the pencil in the corner and drop his arm. He said his arm was numb. I even lit a cigarette and put it in his mouth myself. He didn't take part in any recreation at all. I know that he was consulting doctors from the beginning. How many grades in school he went I couldn't tell you. He went to Cass Technical High School. Before he went to it if I am not mistaken, it is only the fifth or sixth grade. That is the amount of education he received before the war. When I said he went to the Cass Technical High School, I was referring to the government training he received after the war. That was because he was a disabled veteran, they were trying to get him back into something he could make a living at. Before he went away he went through the fourth or fifth grade that's all. He had no special training. He wasn't a bookkeeper, a lawyer, or anything like that. The only work he did was at the Kelsey Hayes Wheel Company. When he came back from the service, I saw he had ruptions on the same side, right side; his ear, cheek and elbow. It looked red and scaly. It went away and came back again. As far as I know he had it right along until he died, it spread toward the last when he died his whole face was covered with it. It was worse and worse all the time. After he came back he had been taking medicine right along, right from the time he got back from the service. He had many bottles there, but I didn't look at them. He had salves and zinc oxide—I seen him put on. That is a white substance. He put that on the sores on the side of his face, his ear and arm. He made an earnest effort to try to do the drawing work at home— he tried hard, because I have watched him myself. After he would try he would pick up the board and put it away. *He never left the house.* He complained about trouble with his head all the time. He made remarks about his head. He said 'my head is splitting.' He would set this way, with his head like this (Indicating)."

And on cross-examination: "My brother lived with my mother and dad when he came back from the service. I was living

two blocks away. *I saw him every day.* I didn't see him all day during the day. During the evening I used to set up with him. I didn't watch him all the time. My brother could read and write English, his education was sufficient for that. I have seen his handwriting and seen him write and read English. I am the administratrix of his estate. He died in 1929, that is correct. *After he came back from the service he didn't do no work at all. After he came back from the service and up to the time that he died he wasn't employed at all. I am certain about that. During the period of about ten years I was in a position to observe every day whether he went to work anywhere and every day I observed that he had not gone to work anywhere."* (All emphasis in foregoing and following quotations is supplied.)

The foregoing might have been considered substantial evidence of total and permanent disability before lapse of the policy, if certain conceded facts and uncontroverted evidence, introduced by both appellee and appellant, had not so conclusively discredited it.

A War Department record, introduced by appellee, shows that insured was returned from France on December 30, 1918, hospitalized at the United States Army Hospital, Hampton, Virginia, until January 6, 1919, and then transferred to Camp Custer, Michigan, for convalescent center duty.

On January 9, 1919, when he was given a physical examination preliminary to separation from the service, he was asked: "Have you any reason to believe that at the present time you are suffering from the effects of any wound, injury, or disease, or that you have any disability or impairment of health, whether or not incurred in the military service?" He answered in the affirmative and described the nature and location of his injury as: "Shrapnel wound in right forearm." On January 11, the examining physician certified: " * * * It is found that he [the soldier named] is physically and mentally sound with the following exceptions: *Healed shrapnel wound* point and middle of right forearm; received in action October 17, 1918, Verdun. No disability. *The wound is not likely to result in death or disability.* In my opinion the wound did originate in the line of duty in the military service of the United States. *In view of occupation he is no per cent disabled.* Remarks: Referred to Board of Review."

The report of the Board of Review stated: "We find, from a careful consideration of the case and a critical examination of the soldier he is physically and mentally sound with the following exceptions: Healed shrapnel wound point and middle of right forearm, received in action October 17, 1918, Verdun. *No disability.* To be discharged. *The wound is not likely to result in death or disability.* In our opinion the wound did originate in the line of duty in the service of the United States. *In view of occupation, he is no per cent disabled."*

Appellee introduced a report by Dr. Oakley, of the Detroit Office of the U. S. Public Health Service, dated May 26, 1919. After describing insured's symptoms, Dr. Oakley concluded: "Diagnosis: Shrapnel wound of right forearm. Eczema. Prognosis: Favorable. Believe skin condition will improve and that he will regain former use of forearm."

It is conceded that insured received vocational training in sheet metal work through the Veterans Bureau, from June 30, 1919, until August 2, 1922, and was paid amounts varying from $8 to $100 per month. Previous to that time he had received $37 per month partial disability compensation.

Dr. Merrill, a U. S. Public Health Service medical officer who examined insured on July 9, 1919, testified for appellee, as follows: "I found he had an old chronic gunshot wound of the forearm. It was not entirely healed—it was draining. It would appear to have broken open and pus was coming out. I felt that there had been a reactuation of the original wound; some foci or pus somewhere in the forearm, *and the probabilities of it recovering would be great."*

The Court asked: "Did the condition you found in his right arm have any other physical effects on the rest of his body?" He answered: "Not physically. Mentally, it would undoubtedly have." On cross-examination, he testified: "I think his left arm was all right. Undoubtedly I set forth all I found was physically the matter with the man I examined and made notations of my examination to the Bureau of War Risk Insurance Litigation. That was what was expected of me and that is what I would do. *Had I seen eczema or psoriasis on the body of this man I would have made notation of that as a diagnosis or finding in my report, if it were of a marked degree."*

Dr. Merrill also testified, over objection, that when he examined insured, "he could not in my opinion have done any real hard work, steady employment," but that "possibly he might have been a gate tender in a factory where he could use his left arm, or he might have been a distributor of bills, something like that, where he could walk around and work, not very strenuously." Asked whether he could do that regularly, he answered: "The condition that arm was in at that time, I don't believe he could definitely, regularly, because it would have to be taken care of and it would probably cause him a lot of discomfort at times."

Appellee introduced a letter, dated July 22, 1919, from surgeon J. H. Oakley, to the United States Public Health Service, which, after describing insured's condition, concluded: "Hand dynamometer reading: Right hand, 115. Left hand, 130. Strength of hand seems to be improving. Diagnosis: Weakness of right forearm as a result of shrapnel wound received in France in line of duty. Chronic eczema."

On December 2, 1919, insured filed sworn application, apparently for partial disability compensation, with the Bureau of War Risk Insurance. As to "Nature and extent of disability claimed," insured merely stated, "Wound on arm, keeps breaking open." In answer to the questions, "Are you confined to bed?" and "Do you require constant nursing or attendance?" the insured answered, "No."

The records of the Federal Board of Vocational Education show that insured's vocational training was terminated on August 2, 1922, when he was declared "Rehabilitated," the last place of training having been the Timken Detroit Axle Company.

Appellee introduced a report, dated August 14, 1922, upon an examination of insured by Dr. R. N. Tassie, of the Veterans Bureau: "Physical examination reveals a well nourished white man of good muscular development, and appears to be in good health. Pupils react to light and accommodation. Nose and ears are normal. Tonsils are large and teeth are in good condition. There are no enlarged glands. Expansion of the chest is good and about even on both sides. The lungs are both in good condition. The heart is normal in size, rate and location. There is no evidence of any pathology in the abdomen. The genitalia are normal. There is no evidence of hernia present. Romberg and Babinski's tests are negative. Knee jerk and ankle clonus are normal. There is a large irregular scar which involves the width of the right forearm at the middle third. There is much scar tissue which appears to invest some of the flexor tendons. There is good healing with no signs of inflammation or tenderness. There appears to be some loss of strength in the right hand. Diagnosis: Shrapnel wound of right forearm with some loss of power of right hand."

A report by Dr. E. O. Sage, of the Veterans Bureau, dated November 9, 1923, stated: " * * * General appearance is healthy. Man is well nourished and developed. Skin is normal. Teeth are in good condition. Head, neck, eyes, ears, nose and throat are negative. Reflexes are normal. Heart: No murmurs. Rate, rhythm, size and position are negative. Lungs and thorax are normal. Examination of abdomen reveals no pathology. Spine, joints and lower extremeties are negative. Right forearm presents a large, irregular transverse scar on flexor surface. Referred to attending orthopedic specialist, but man failed to report to same. Diagnosis: Gunshot wound, right forearm."

On December 4, 1923, insured wrote Dr. Sage, as follows: "Mr. E. O. Sage, Subdistrict Medical Officer, U. S. Veterans' Bureau, Detroit, Michigan, Dear Sir: I have been requested by the Veterans' Bureau to call at the Veterans' Bureau office to interview the chief examiner, I have called at the office two times but could not be taken care of as there were too many ahead of me. I was told to call later, at my earliest convenience. I regret very much to say that it is almost impossible for me to call this week, unless I am willing to lose my job. However, I cannot afford to lose my job as I am very much in need of money, and I can't do any job that comes along because of my handicap. If you will grant me a little more time I shall appreciate it very much. I will call within ten days if you will grant me that much time."

On December 21, 1923, Dr. C. A. Berge, orthopedic specialist in the Veterans Bureau, reported as follows: "General considerations—well nourished, healthy looking male of medium build. Right upper extremity: No pathology above forearm —being no disease. Forearm shows normal pronation and supination. Transverse scar four inches by one-half inch, to three

quarter inches across flexor side of forearm at junction middle and upper third, which is adherent to the fascia over the forearm, but does not retract on movements of hand, and does not appear to be bound down to any of the muscles. *The injury has been a transverse grooving laceration across forearm at this level, which was just a little too superficial to catch the trunks of median and ulnar nerves. Scar is not tender and is grooved and depressed about one-quarter inch. No paralysis. No atrophy. No tenderness.* Localized loss muscle substance in scar from brachio radialis, pronator radii terus, and flexor carpi radialis. *No tension producing scar adhesions evidenced by flexion and extension of wrist or digits—fingers—of hand. Wrist shows normal flexion, extension, abduction, and adduction, without pain.* Hand normal throughout, with exception anaesthesia over thumb in musculo cutaneous nerve distribution, shows same temperature through as fellow on left. *All muscles active throughout. Circulation normal throughout. No swelling, redness, or tenderness anywhere. Gripping strength of hand ninety per cent normal.* Comparative circumferential measurements: Right arm, 10¾ inches; left arm, 10¾ inches; right forearm, 10¾ inches; left forearm, ten and one-half inches. No evidence of injury; bones or articular surfaces."

When insured applied for employment with the Packard Motor Car Company, he was examined, on February 28, 1924, by Dr. H. E. Wisner, who testified, as follows: "I found when I examined him that the vision was normal; his height was five feet and six inches; his weight, 156 pounds, and there was a knife scar just below the elbow on the anterior surface of the right arm. I did not make any other physical findings other than those I have testified to. Those are the only things I observed on the man, of which I made a record at the time of the examination. *I recommended the man for employment so far as his physical condition was concerned.*"

Employment records show that, when insured obtained employment at the Packard Motor Car Company, he said he had previously been employed by the American Motor Body Company for a period of two and one-half months, and that he had left there in December, 1923. These records also show that insured was employed by the Packard Company from February 29, until April 17, 1924; that his employment was terminated on account of sickness, but he was re-employed on February 5, 1925; and that he left shortly thereafter for another job. His skill and production were rated as average.

On April 20, 1924, insured was again examined by Dr. Berge, of the Veterans Bureau. His second report does not differ substantially from that made in December, 1923.

On April 30, 1924, Dr. Sage reported: "General condition is good. Well nourished, developed and healthy looking. Height, 68½ inches. Weight 165 pounds. Skin is warm, good color. Head: Eyes, ears, nose and throat are negative. Teeth in fair repair. Neck shows no abnormal enlargements. Thorax: Well shaped, broad and deep, mobility is good. Lung findings are clinically negative. Heart: Apparently normal in size, rate and rhythm. Abdomen: No tenderness, palpable masses or hernia. Genitalia: Negative. Extremities: *Transverse scar four inches long across flexor side of right forearm middle third. Scar is well healed but grooved and adherent—loss of muscle substance. No redness or tenderness. Hand grip slightly impaired.* Referred to orthopedic surgeon. Other extremities are negative."

Employment records show that insured was employed by the Fisher Body Corporation, from September 30 until October 29, 1924, when there was a lay-off, and that his foreman would rehire him.

We are of the opinion that none of the medical testimony suggests total and permanent disability before lapse of the policy, but that it clearly proves the contrary.

For more than ten years after the policy lapsed, insured made no claim that he was totally disabled, and such failure has been held to constitute strong evidence that the insured was not totally and permanently disabled prior to lapse of the policy. Lumbra v. United States, 290 U.S. 551, 560, 54 S.Ct. 272, 78 L.Ed. 492; United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617. Moreover, insured's own statements clearly indicate that he did not regard himself as even temporarily totally disabled.

After careful examination of the record, we are of the opinion that the evidence and all inferences that may be drawn from it do not constitute sufficient basis for a verdict for appellee and that the District Court

should, therefore, have directed the jury to find for appellant. Compare with United States v. Spaulding, supra.

Appellant has assigned as error the admission of certain evidence. In arriving at the conclusion indicated, we have considered all this evidence in the light most favorable to appellant. Under the circumstances, we deem it unnecessary to consider appellant's exceptions to its admission.

Judgment reversed.