Julian **BELSKY**, Plaintiff,

v.

Arthur S. **FLEMMING**, Secretary of Health, Education and Welfare, Defendant.

Civ. No. 34620.

United States District Court
N. D. Ohio, E. D.

Dec. 11, 1959.

Cerrezin & Cerrezin, Richard M. Cerrezin, Cleveland, Ohio, for plaintiff.

Russell Ake, U. S. Atty., George W. Morrison, Asst. U. S. Atty., Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

This is an action brought under Section 205(g) of the Social Security Act (hereinafter referred to as the Act), 42 U.S.C.A. § 405(g) to review a decision of the Secretary of the Department of Health, Education and Welfare, denying plaintiff's application for a "period of disability."

In his complaint plaintiff alleges that he filed with the Bureau of Old Age and Survivor Insurance of the Social Security Administration a claim for a "period of disability" on the ground that he was unable to engage in any substantial gainful activity since March 1947 by reason of a medically determinable physical condition which could be expected to be of lengthy, continuous and indefinite duration. He avers that his claim was denied by the Referee, whose decision was affirmed by the Appeals Council and adopted by the Secretary. Defendant in his answer avers that plaintiff has no claim upon which relief can be granted under the Act and the regulations promulgated thereunder, and filed a transcript of the record upon which the decision under review was rendered. Defendant further alleges that the findings of fact made by the Referee and affirmed by the Appeals Council, are supported by substantial evidence and are conclusive. Subsequently defendant filed a motion for summary judgment.

Under the September 1954 amendments to the Act, Congress added so-called disability freeze provisions under the terms of which a worker who suffers a disability as defined by the Act is entitled to receive his old age monthly retirement benefits without diminution on account of his inability to work by reason of "any medically determinable physical or mental impairment' which can be expected to result in death or to be of long-continued and indefinite duration." (§ 416(i) (2), 42 U.S.C.A.) The need for the disability freeze is clearly stated in the Senate, House and Conference Reports found in Volume 3 U. S. Code Congressional and Administrative News 1954, pp. 3710 et seq. Beginning at p. 3729, it is stated *inter alia* that:

"* * * When benefit amounts are computed under present law, whether for retirement benefits or survivors benefits, his total earnings after a specified starting date and up to age 65 or death are divided by the total elapsed time, including any periods of total disability, in determining his average monthly wage, on which monthly benefits are based. A freeze of old-age and survivors insurance status during extended total disability would remove this disadvantage by preventing such periods of disability from reducing or denying retirement and survivors benefits. * * *

"Such a freeze provision is analogous to the 'waiver of premium' commonly used in life insurance and endowment annuity policies to maintain the protection of these policies for the duration of the policyholder's disability."

The burden of proof before the Referee and in this proceeding is upon the plaintiff. Section 405(g) of the Act provides, in part: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive."

The decision of the Secretary must be examined in the light of the foregoing principles.

The record made before the Referee includes testimony of the plaintiff and his counsel and documentary evidence consisting in large part of reports of medical examinations of plaintiff and opinions of several physicians relevant to plaintiff's "disability."

Plaintiff attained the age of 65 on September 23, 1954, and was awarded social security benefits effective September 19, 1954, in the amount of $69.70 per month. On July 1, 1955 plaintiff filed an application to establish a "period of disability," alleging that he first became unable to engage in substantial work in March 1947. Plaintiff had been employed in the milk cooler department of The Telling Belle-Vernon Company for 27 years, where he unloaded cases of milk from a conveyor. He has no special training or skill and his formal education terminated with the third grade of grammar school. He was injured in March 1947 by a case of milk falling upon his chest and later that month sustained an additional injury by falling forward on his hand and chest.

He performed no work after his second injury until December 27, 1947. He resumed work at that time and continued working until February 27, 1948, when he quit because of his physical condition.

The Industrial Commission of Ohio classified plaintiff as being temporarily and totally disabled from March 11, 1947 to February 9, 1951, and reclassified him in July 1953 as being totally and permanently disabled. The Veterans Administration gave him a "permanent total" rating for non-service pension purposes effective January 1950. Some time before May 23, 1951 the Travelers Insurance Company determined that he was permanently and totally disabled for insurance purposes. The Referee held that plaintiff met the last "quarter of coverage" requirement of the Act in the quarter ending June 30, 1949. This holding is not challenged by plaintiff. In his application for a disability period plaintiff stated *inter alia:* "I have severe pain in my back, hands, side and leg and have been receiving treatment for this condition for some time." He states further: "This condition was bothering me for some time before I stopped working during March 1947. * * * I tried to resume working again in 1948 but this condition still bothered me." The decision of the Referee that "Claimant is not entitled to a 'period of disability'" is based upon his finding that the evidence "is entirely insufficient to establish that in the second calendar quarter of 1949 the claimant had a disability as defined in Section 216(i) of the Social Security Act." In making such determination the Referee relied principally, if not entirely, upon reports of medical examinations of plaintiff made shortly prior to and after June 30, 1949 and before June 1952. The Referee considered reports subsequent to the last mentioned date as not being relevant to plaintiff's physical and mental condition in the second quarter of 1949.

It is undisputed that plaintiff did no work after February 1948 and that in not making an effort to work he was following the advice of his physician.

Following his injuries in March 1947, plaintiff was first seen by his employer's physician. He then consulted Dr. Robert E. McMahon, who treated him and was his personal physician from June 1947 to September 1950. Plaintiff was confined to St. Vincent's Charity Hospital from

June 22, 1947 to July 16, 1947. A report of that institution discloses the following:

> "Diagnosis: Pernicious anemia.
> X-rays reveal: Narrowing of 3rd metacarpophalangeal joint space. Small esophageal hiatus hernia of the cardiac portion of the stomach."

At the time of this examination plaintiff complained of pain in the chest, lower right side, dizzy spells and weakness in the arms and legs. He also stated that he had noticed weakness in his arms and legs for the past year which comes on with exertion especially when attempting to work.

Plaintiff was examined at University Hospitals on October 7, 1947 but no diagnosis was made at that time. He was hospitalized at this institution from February 25, 1948 to March 12, 1948, during which time he was carefully examined and an extensive report of his condition submitted. The diagnosis was:

> "460–533 Hypertensive vascular disease.
> 810–7722 Hypothyroidism."

Although there is no diagnosis of anemia, the report contains the following:

> "Gastric analysis: No free HCl degrees after histamine. * * * Placed also on ferrous sulphate for anemia. Clinically patient appeared more alert prior to dismissal, had better color, he reported subjective improvement. RBC had arisen to 4,200,000 but no marked increase of Hgb."

A report made from an examination of the records of The Cleveland Clinic relative to plaintiff's examination at that institution on April 27, 1948 discloses the diagnosis of: "(Major) Anemia—Type. Code 513–400.09."

From September 9, 1948 to September 20, 1948 plaintiff was again hospitalized at University Hospitals. He complained of pains in his shoulders and legs of more than a year's duration and stated that 3 years earlier he noticed weakness and unsteadiness of gait. Plaintiff was described in the report as: "A pale, chronically ill, elderly looking male." Examination revealed some tenderness in the groin and over the gracilis muscles, bilaterally and moderate tenderness, upon pressure, over the midsternal area. The following also appears in the report:

> "Nothing was found to explain patient's symptoms and he was discharged on the 11th hospital day to be followed by his private dr."

The diagnosis was: "Hypothyroidism. Diaphragmatic hernia, history of." There was reference also to plaintiff's anemia and it was found: "Gastric analysis showed no free H.C.l., 16 units total free acid after histamine."

A report of an examination made by the Veterans Administration on May 1, 1950 shows the following diagnosis:

> "1. Anemia, hypochromis, normocytic, mild, cause undetermined (no medication for the past year).
> "2. Arterial Hypertension, mild.
> "3. Hypothyroidism, mild, by history.
> "4. Esophageal hiatus hernia, from history.
> "5. Scars, residual from surgery for bilateral herniorrhaphy, well-healed."

On November 30, 1950, Dr. Robert McMahon, plaintiff's personal physician, submitted a report of plaintiff's condition to The Travelers Insurance Company on a printed form supplied by the company. As shown by the report, Dr. McMahon first examined plaintiff in June 1947 and his last examination was on September 30, 1950. Dr. McMahon's diagnosis was: Myxedema; diaphragmatic hernia; hypertensive vascular disease. His prognosis was: "Poor." In answer to the

question on the printed form: "Is the claimant totally or partially disabled from engaging in any and every occupation at this time?" Dr. McMahon answered: "Totally."

The patient's subjective symptoms were stated to be: "Loss of memory, disorientation, weakness, somnolence." Objective findings—BMR –34, –28.

On September 13, 1950, Dr. Robert Nicholson made a report on a printed form furnished by the Industrial Commission of Ohio in which he listed plaintiff's complaints as: "Fatigue; weakness; loss of appetite; pain in legs; dyspnea." The objective symptoms were stated to be: "Pallor; apathy; weakness; weepy and is depressed." Dr. Nicholson also stated that normal recovery had been delayed because: "Man is steadily degenerating, physically and mentally." In answer to the question: "Is further treatment necessary—and for how long?" the Doctor answered: "Indefinitely." The Doctor's answer to the question relating to plaintiff's ability to resume light work was: "Will never be able to resume work." Under the heading of "Remarks" Dr. Nicholson observed: "My last letter to you was dated October 31, 1947. In February 1948 Mr. Belsky was admitted to University Hospitals, Cleveland, where it was found, in addition to the existing hiatus hernia, that: "Myxedema existed. In spite of thyroid therapy he has not improved. I do not know whether or not *emphysema* (?) (illegible) is related to his work but the man is *so helpless* I feel that a consultation would be advisable." (Emphasis supplied).

A report of Dr. Harry Sherman of January 2, 1951, based upon his examination of plaintiff on December 14, 1950, shows: "Extreme local tenderness on the 9th rib at the posterior axillary line. Movements of the whole back are slow and painful." The report also contains the following comment:

"Nothing very specific can be found. He has myxedema. This might account for some of his alleged weakness but certainly should

have nothing to do with his injury. The anemia which he has, has been accepted as being related presumptively to his injury due to a possible relationship to the hiatus hernia although such a degree of anemia is not common for such a condition. This condition probably also causes his precordial pain. The anemia may cause his dyspnea and weakness although part of the dyspnea is apparently due to chronic pulmonary emphysema, which is not related. Patient's condition is now substantially the same as at the last contact and at the contact of the Cleveland Clinic. There is therefore no indication for change of the previous award."

A "Specialist Report" to the Industrial Commission signed by Dr. Donald W. Bortz, of the Cleveland Clinic staff, under date of March 23, 1951, based upon an examination of the plaintiff on March 23, 1951, was submitted to the Industrial Commission. The report describes the plaintiff's symptoms as being: "Remarkably similar to Dr. LaTona's history of April 1948." (Cleveland Clinic) The report shows that as a result of tests and studies a finding was made that an adequate supply of free hydrochloric acid was obtained from the gastric contents. This finding ruled out the previous diagnosis of pernicious anemia. Dr. Bortz also made the following comments:

"I think that one must continue to assume that the symptoms of which this patient complains are on the basis of his previous injuries. I do feel, however, that there is a lowered threshhold of tolerance to pain here which is probably aggravating the symptoms a great deal. * * * I would classify this patient as being temporarily totally disabled as of this date, his disability being related to his previous two injuries in addition to the natural process of aging."

Dr. Sherman submitted a further report to the Industrial Commission on July 7, 1952, based on his examination of June 27, 1952. Although this exam-

ination was not made prior to June 1952, it is nevertheless relevant to plaintiff's physical condition as of the second quarter of 1949. Dr. Sherman's findings are as follows:

"Examination reveals the claimant to be a tall man who moves slowly due to apparent pain. He is pale. The head is negative. The neck is painful on motion. The chest is normal to examination. Blood pressure 172/94. The tissue on the back of each hand is somewhat thinned and is shiny. The right hand and wrist are swollen and painful on motion. Claimant states that this was formerly worse than the present appearance. Movements of the back are slowly performed and moderately restricted. Claimant has particular pain on the inner right thigh and restricts motion in this thigh to a high degree from this cause."

The report contains the following comment:

"The symptomatology is bizarre. The claimant obviously could not perform any significant exertion. I doubt that most of this is the result of the accident detailed."

"Recommend continuation of Temporary total one year with re-examination".

In 1950 Dr. McMahon moved from Cleveland, Ohio, and his office associate, Dr. Grace Haskins, then became plaintiff's physician. Under date of January 19, 1956 Dr. Haskins submitted a report to the Department of Health, Education & Welfare in which she noted plaintiff's subjective symptoms as "Weakness, pain in back and legs." Her diagnosis was: "Generalized arterial sclerosis. Hypertrophic arthritis. Hypothyroidism. Hiatal hernia." She described plaintiff's progress as: "Progressively downhill. Do not expect improvement." Under the caption "Remarks" Dr. Haskins stated:

"This patient has been totally disabled since 1947. In spite of treatment his course has been slowly downhill."

As shown by the foregoing, all of the physicians whose opinions were sought were convinced that at the times of their respective reports the impairment of plaintiff's physical condition was such as to prevent his engaging in any gainful employment.

The record also discloses on April 19, 1951 the Travelers Insurance Company wrote counsel for plaintiff advising that it would be necessary for plaintiff to be examined by the company's examining physician, Dr. Wilson J. Chamberlain, before action would be taken on plaintiff's claim under the policy. Although Dr. Chamberlain's report does not appear in the record, it is fairly to be inferred from the allowance of plaintiff's claim by the insurance company that Dr. Chamberlain concurred in the opinion which Dr. McMahon submitted to the company. Thus, notwithstanding the unanimity of opinion of competent medical authorities that plaintiff was totally disabled, the Referee held the evidence to be "entirely insufficient" to establish that in the second quarter of 1949 plaintiff was suffering from a physical impairment that could reasonably be expected to be of long, continued and indefinite duration. It is quite clear that the Referee accorded no weight to such opinion evidence and relied upon his own interpretation of the reports of the examinations of plaintiff at the hospitals and the Veterans Bureau.

Standing alone, these reports, which contain no prognoses, might constitute "substantial evidence" supporting the Referee's finding of ultimate fact. However, it is not enough that the evidence supporting the Referee's finding be regarded as "substantial" when considered apart from all of the other evidence in the case. Compare: Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 477, 478, 71 S.Ct. 456, 95 L.Ed. 456.

The Administrative Procedure Act, Sec. 1009, Title 5, provides for judicial reviews of administrative agency actions and does not except reviews under the Social Security Act from its operations. Section 1009, Title 5, provides *inter alia*:

" * * * the reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * (5) unsupported by substantial evidence in any case subject to the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of an agency hearing provided by statute * *."

It is further provided that:

" * * * In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

See Julian v. Folsom, D.C., 160 F.Supp. 747, at page 749.

In Gooding v. Willard, 209 F.2d 913, 916, the Second Circuit Court of Appeals defined "substantial evidence" as follows:

" * * * 'substantial evidence' means more than evidence which, considered by itself alone, would be sufficiently persuasive to induce the trier of fact to give it the credence and weight essential to support findings. It must have those characteristics to such an extent that in the setting made by the entire record the trier may reasonably find in accordance with it after giving due consideration to whatever else is shown both in opposition or in accord. Judicial review has been extended by the Administrative Procedure Act to embrace adequate exploration of the record as a whole to enable the reviewing court to arrive at its own judgment in determining that."

The foregoing standard is applicable here. It is, of course, true that this Court must accept the inferences drawn by the Referee from the evidentiary facts if such inferences are reasonable. In view of the Referee's determination that the evidence was "entirely insufficient" to support plaintiff's claim, the reasonableness of the inferences drawn by the Referee from the reports of the hospitals and the Veterans Bureau as well as his evaluation of the opinion evidence in the case are the critical matters to be considered in this review. The question before the Referee was the severity of plaintiff's impairment in the second quarter of 1949 and its probable duration. Under the statute, this was a medical question. All of the institutional reports indicated that plaintiff was suffering an impairment of health. He was found to be afflicted with anemia, hypothyroidism and hypertensive vascular disease. Generally speaking, these reports contained few, if any, clinical findings or objective symptoms that verified plaintiff's subjective complaints. But neither did the reports contain any findings that ruled out the genuineness of plaintiff's subjective symptoms. These reports contained no prognoses. The Referee's conclusions based upon the evidence in such reports necessarily reflect a layman's view of plaintiff's condition of health in the second quarter of 1949. In the absence of countervailing evidence, the inferences drawn by the Referee from such reports would be adequate to sustain his finding of ultimate fact. However, for the reasons stated above, the substantiality of the evidence supporting the Referee's finding must be determined upon an examination of the whole record. In rejecting the opinion of Dr. McMahon, the Referee found it to be unsatisfactory because of the absence of clinical findings supporting some of the diagnoses and the failure of the report to note complaints similar to those appearing in plaintiff's application. However, the Referee overlooked the following significant facts in relation to Dr. McMahon's opinion. At the time of his report in September 1950, Dr. McMahon had been treating plaintiff for more than three years. He had twice ordered plaintiff committed to University Hospital for diagnosis and therapy. Undoubtedly he was cognizant of the contents of the reports of that hospital. Whether he was responsible for plaintiff's commitment to Charity Hospital in June of 1947 does not clearly appear but

it is fair to assume that he was also familiar with the report of that institution. As a result of the information in the hospital reports and the knowledge gained by his examinations and frequent observations of plaintiff, Dr. McMahon was especially qualified to pass judgment on plaintiff's condition of health in September 1950 and to prognosticate the future progress of plaintiff's disability. By reason of facts hereinabove noted, it is fair to assume that the examining physician for the Travelers Insurance Company arrived at the same opinion expressed by Dr. McMahon. Further corroboration of Dr. McMahon's opinion is found in the report of Dr. Nicholson made on September 19, 1950. It is to be remembered that soon after he assumed responsibility for the care and treatment of plaintiff, Dr. McMahon advised him not to work. In view of these circumstances, the Referee's failure to accord weight to Dr. McMahon's opinion would seem to be unreasonable. The Referee dismissed Dr. Nicholson's opinion that plaintiff was and would continue to be unable to do "any light work" as an unsupported statement of opinion. Such an evaluation of Dr. Nicholson's testimony is unwarranted. Dr. Nicholson's testimony is set forth in the report to the Industrial Commission and as shown therein, Dr. Nicholson wrote to the Commission relative to plaintiff's condition in October 1947.

The examination of September 1950 was the second time Dr. Nicholson had an opportunity to examine and observe plaintiff. The Doctor's reference to plaintiff's admission to University Hospital in February 1948 and the findings made at that time also indicate his knowledge of plaintiff's condition prior to the examination of 1950. Dr. Nicholson's statement that "man is steadily degenerating mentally and physically" was not based upon his first impression but was the opinion of a competent medical authority based upon a comparison of plaintiff's condition at an earlier time and his condition as found by Dr. Nicholson in September 1950. The Referee apparently disregarded Dr. Nicholson's statement that " * * * the man is *so helpless* that I feel a consultation would be advisable." (Emphasis supplied.) The need of consultation referred to by the doctor was to determine whether plaintiff's impairment was related to an injury sustained while at work. Under the law of Ohio, this was a matter of concern to the Industrial Commission in considering an allowance of an award but is of no materiality here. In the light of these facts, it seems apparent that the Referee's summary dismissal of Dr. Nicholson's opinion that plaintiff "will never be able to resume work" was unreasonable. The Referee found that Dr. Sherman's report of January 2, 1951 revealed no evidence of disability as defined by the Act. However, the Referee failed to give effect to Dr. Sherman's finding of plaintiff's pain on movement of his back and pain in the biceps area and right thigh. Further, the Referee disregarded Dr. Sherman's recommendation to the Industrial Commission of a continuance of the award previously made. Implicit in such recommendation was the doctor's opinion that on September 2, 1951, plaintiff was totally and temporarily disabled. The Referee made no reference to the comment of the specialist, Dr. Bortz, of the Cleveland Clinic, wherein he attributed plaintiff's disability to his injuries and the aging process nor did the Referee give any effect to Dr. Bortz' statement: "I do feel, however, that there is a lowered threshhold of tolerance to pain which is probably aggravating the symptoms a great deal." Apparently Dr. Bortz' classification of plaintiff as being temporarily and totally disabled as of the time of his examination in March, 1951 was accorded no weight. The Referee attributed significance to the statement in Dr. Sherman's report of July 7, 1952 that "the symptomatology is bizarre" but ignored the significance of the very next sentence of the report wherein the doctor stated: "The claimant obviously could not perform any significant exertion."

Relying on United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, defendant argues that the opinions of the doctors ought not to have been received and are entitled to no weight. In Spaulding, however, the jury was competent to decide the ultimate issue without the aid of expert testimony. Here the severity and probable duration of plaintiff's impairment of health was primarily a medical question, the determination of which by laymen required the aid of expert medical testimony. Compare: Simpson v. Standard Oil Co., 2 Cir., 223 F.2d 306. See also: United States v. Calvey, 3 Cir., 110 F.2d 327, 330. It is generally recognized as a medical fact that an injury or disease which may only slightly affect one person's ability to work may permanently incapacitate another. As the Supreme Court said in Lumbra v. United States, 290 U.S. 551, at pages 558–559, 54 S.Ct. 272, at page 275, 78 L.Ed. 492:

"The phrase 'total permanent disability' is to be construed reasonably and having regard to the circumstances of each case. * * * The various meanings inhering in the phrase make impossible the ascertainment of any fixed rules or formulae uniformly to govern its construction. That which sometimes results in total disability may cause slight inconvenience under other conditions. Some are able to sustain themselves, without serious loss of productive power, against injury or disease sufficient totally to disable others."

In reaching his conclusion, the Referee relied upon the expression of the Congressional intent as stated in Committee Report No. 1698, p. 23, 23rd Congress, which in part reads:

"Only those individuals who are totally disabled by illness, injury, or other physical or mental impairment which can be expected to be of long-continued and indefinite duration may qualify for the freeze. The impairment must be medically determinable and preclude the individual from performing any substantial gainful work."

The Referee is entitled to make independent findings in accordance with the strict requirements of the Act irrespective of the findings made by other administrative agencies. However, in view of the evidence, which shows indisputably that plaintiff's health was seriously impaired from and after 1947, and the uncontradicted medical testimony that such impairment was expected to be of long-continued and indefinite duration, I am of the opinion that the Referee's holding that—"the evidence is entirely insufficient to establish that in the second calendar quarter of 1949 the claimant had a 'disability' as defined in Section 216(i) of the Social Security Act"—is not sustained by substantial evidence. Accordingly defendant's Motion for Summary Judgment is overruled.

Section 416(i) (2), Title 42, provides in part:

"No such period shall begin as to any individual unless such individual, while under a disability, files an application for a disability determination with respect to such period."

As interpreted by the Referee, this provision

" * * * means that the claimant cannot be entitled to a period of disability unless he had a disability as defined in section 216(i) (1) of the Social Security Act on July 1, 1955."

Although the Referee expressed doubt whether claimant met the above requirement, no finding was made with respect thereto. This case is therefore remanded for the purpose of determining whether, at the time of filing his application, plaintiff was suffering from a "disability" as defined by the Act.